(No. 95132.—

*In re* MARRIAGE OF ROBERT L. CROOK, Appellant, and PATRICIA J. CROOK, Appellee.

*Opinion filed June 24, 2004.*

J. Steven Beckett and Brett N. Olmstead, of Beckett & Webber, P.C., of Urbana, for appellant.

Arthur M. Lerner, of Lerner & Kirchner, of Champaign, for appellee.

JUSTICE KILBRIDE delivered the opinion of the court:

The petitioner, Robert L. Crook, appeals from the decision of the appellate court holding that: (1) the trial court erred in its division of retirement funds, and (2) the marital estate was not entitled to reimbursement of $40,000 for payment made on a joint loan for improvements to nonmarital property. 334 Ill. App. 3d 377. This court allowed Robert's petition for leave to appeal. 177 Ill. 2d R. 315. We reverse in part and affirm in part.

## I. BACKGROUND

The petitioner, Robert L. Crook, and the respondent, Patricia J. Crook, were married for 33 years. Robert was a farmer until 2000, when he became a truck driver. Patricia worked in the home for 10 years and then as a school secretary for 22 years.

Patricia retired from her job as a secretary at Parkland College in July 2000, after accepting an early retirement incentive plan. Patricia is not eligible to receive Social Security benefits. The parties stipulated that Robert's current Social Security benefits entitlement is $850 per month and will increase as Robert continues to work. Patricia may receive a nominal Social Security benefit as Robert's former spouse if she does not remarry.

During the marriage, Robert farmed land owned by Patricia's family. Patricia was raised on the farm and had spent most of her life there. The farmhouse where Robert and Patricia lived during most of the marriage originally belonged to Patricia's parents, who deeded the farmhouse and five acres of the farm to her in 1983. The property

also contained a machine shed, a barn, a crib, a shop, and a steel grain bin. The buildings on the property were used as part of the farming operation. In approximately 1993, the parties jointly borrowed money from Central Illinois Bank to build a new shed on the property to store farm equipment. The new shed replaced a barn that had burned.

When Robert quit farming, the parties agreed to sell the farm equipment. Following the sale of some of the farm equipment, $50,000 of the proceeds was placed into the parties' joint bank account. After Robert filed for a dissolution of marriage, Patricia withdrew $42,000 from the account and applied $40,000 to the parties' shed construction loan when she became concerned that Robert might file for bankruptcy. Robert withdrew the remaining $8,000.

On June 20, 2001, the trial court entered a memorandum opinion and supplemental order. The trial court awarded Robert a $18,000 SEP retirement account and a $2,000 Roth IRA. The trial court then equally divided the remaining payments on Patricia's retirement funds from the Parkland College early retirement incentive plan, her State University Retirement System benefits, and her Illinois Municipal Retirement Fund benefits. The trial court's order resulted in an equal division of Patricia's retirement benefits with each party receiving approximately $838 per month until July 2004, based on Patricia's current early retirement incentive income. After July 2004, when Patricia's early retirement incentive payments from Parkland College cease, each party will receive only $460.20 per month from Patricia's remaining retirement funds. In reaching its conclusion as to the division of Patricia's pension benefits, the trial court did not consider the $850 in anticipated Social Security benefits Robert would receive upon his retirement.

The trial court also determined that the marital estate was entitled to a $40,000 reimbursement for the funds Patricia withdrew from the joint account and applied to the debt incurred by the parties to build the shed on Patricia's nonmarital property. The trial court ordered Patricia to reimburse the marital estate by paying $40,000 of the 2000 tax liability of $67,991, plus one-half of the remaining tax liability.

Patricia appealed the trial court's division of retirement funds and its order that she reimburse the marital estate $40,000 for payment made on a joint loan for improvements to nonmarital property. The appellate court reversed the trial court's order regarding pension benefits, holding that the trial court should have considered Robert's anticipated Social Security benefits in making a division of Patricia's pension benefits. The appellate court remanded the cause for reconsideration of the division of Patricia's benefits with instructions to consider Robert's anticipated Social Security benefits in "striv[ing] to arrive at a division of property that is equitable to both parties and places each party in similar economic circumstances." 334 Ill. App. 3d at 390.

The appellate court also reversed the trial court's order requiring Patricia to reimburse $40,000 to the marital estate, determining that the debt was marital and that the marital estate was not entitled to reimbursement because it "had been more than compensated for this contribution" through the use of the property during the marriage. This court allowed Robert's petition for leave to appeal. 177 Ill. 2d R. 315.

## II. ANALYSIS

Robert presents two issues for review: (1) whether a court may offset a perceived disparity in Social Security benefits by awarding one party to a divorce a greater share of marital pension benefits; and (2) whether the marital estate is entitled to reimbursement of $40,000

for payment made on a joint loan for improvements to nonmarital property.

### A. Division of Retirement Benefits

The issue of whether a court may offset a perceived disparity in Social Security benefits by awarding one party to a divorce a greater share of marital pension benefits is an issue of first impression in this court. Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/503(d) (West 2000)) requires the trial court to divide marital property in "just proportions," taking into account enumerated statutory factors and any additional factors the court deems relevant. Pension benefits attributable to contributions made during the marriage are marital property. 750 ILCS 5/503(b)(2) (West 2000). Thus, in this case we must examine the interplay between the Illinois Marriage and Dissolution of Marriage Act and the Social Security Act. This presents a question of law that we review *de novo*. *People v. Chapman*, 194 Ill. 2d 186, 217 (2000) (*de novo* standard of review is applicable when there are no factual or credibility issues and the issue presented is purely a question of law).

In enacting the Social Security Act (Act), Congress created an extensive and highly regulated public benefit plan. See *Helvering v. Davis*, 301 U.S. 619, 81 L. Ed. 1307, 57 S. Ct. 904 (1937). As part of this plan, Congress reserved to itself the exclusive power to alter, amend, or repeal any provision of the Act. 42 U.S.C. § 1304 (2000). Because Congress reserved the authority to amend or repeal provisions of the Act, the United States Supreme Court has held that Social Security beneficiaries have a "noncontractual interest" in Social Security benefits, and that these benefits are not to be considered as an accrued property right. *Flemming v. Nestor*, 363 U.S. 603, 609-10, 4 L. Ed. 2d 1435, 1443-44, 80 S. Ct. 1367, 1372 (1960). The Court has contrasted an individual's noncon-

tractual interest in Social Security benefits with a person's contractual interest in a private pension plan: in the latter, the right to benefits is assured and is based upon that person's payments into the plan. *Flemming*, 363 U.S. at 610, 4 L. Ed. 2d at 1443-44, 80 S. Ct. at 1372. Indeed, the Court has observed that "[t]o engraft upon the Social Security system a concept of 'accrued property rights' would deprive it of the flexibility and boldness in adjustment to ever-changing conditions which it demands." *Flemming*, 363 U.S. at 610, 4 L. Ed. 2d at 1444, 80 S. Ct. at 1372.

Germane to this case, Congress has also specifically provided for division of Social Security benefits where a husband and wife seek divorce. Section 402 of the Act enumerates the benefits to be received by divorced spouses, providing to them, under circumstances specified by Congress, a portion of their former spouse's benefits. 42 U.S.C. § 402(b)(1) (2000). Thus, Congress has crafted a statutory scheme that strictly regulates and limits the payment of derivative Social Security benefits to a divorced spouse.

Emphasizing Congress' desire to regulate payments of benefits under the Act, section 407(a) (42 U.S.C. § 407(a) (2000)) prohibits a beneficiary from transferring or assigning his or her benefits to another. Specifically, this provision provides that

> "[t]he right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment or other legal process, or to the operation of any bankruptcy or insolvency law." 42 U.S.C. § 407(a) (2000).

Thus, section 407(a) "imposes a broad bar against the use of any legal process to reach all social security benefits." *Philpott v. Essex County Welfare Board*, 409 U.S. 413, 417, 34 L. Ed. 2d 608, 612, 93 S. Ct. 590, 592

(1973). Although Congress has carved a narrow exception to this rule to allow the collection of past due child support or alimony ("maintenance" in Illinois) from Social Security benefits (42 U.S.C. § 659(a) (2000)),[1] Congress has also explicitly excluded any similar payment obligation arising from a "community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." 42 U.S.C. § 659(i)(3)(B)(ii) (2000).

It is with this statutory framework in mind that the question presented in this appeal must be analyzed. The United States Supreme Court has never addressed the precise issue in the cause before us: whether a state court may consider federal Social Security benefits in determining the division of assets in a marital dissolution proceeding. Guidance may be gleaned, however, from the Supreme Court's decision in *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 59 L. Ed. 2d 1, 99 S. Ct. 802 (1979), where the Court addressed the similar question of whether retirement benefits awarded to an ex-spouse under the federal Railroad Retirement Act of 1974 (45 U.S.C. § 231 *et seq.* (2000)) could be subject to attachment or an offsetting award during state divorce proceedings. The Court determined that, under the principle of federal preemption arising from the federal constitution's supremacy clause, either a division of those benefits or an offsetting award in the state divorce action impermissibly conflicted with the Railroad Retirement Act.

Although the Supreme Court's decision in *Hisquierdo* specifically addressed the treatment in state marital dissolution proceedings of benefits flowing from

---

[1]Section 659 was primarily designed to combat increases in welfare payments that resulted from an inability to compel payment of support obligations from solvent but unwilling individuals. S. Rep. No. 93—1356, at 42-43, *reprinted in* 1974 U.S.C.A.A.N. 8133.

the Railroad Retirement Act, the analysis employed in the *Hisquierdo* case has been recognized as applying equally to Social Security benefits. See, *e.g., In re Marriage of Boyer*, 538 N.W.2d 293, 294-95 (Iowa 1995); *In re Marriage of Olson*, 445 N.W.2d 1, 6-7 (N.D. 1989); *In re Marriage of Swan*, 301 Or. 167, 173, 720 P.2d 747, 750 (1986); *In re Marriage of Zahm*, 138 Wash. 2d 213, 219, 978 P.2d 498, 501 (1999). In fact, *Hisquierdo* frequently drew parallels between the Railroad Retirement Act and the Social Security Act, and analogized their provisions throughout the opinion, holding that they are fundamentally similar. *Hisquierdo*, 439 U.S. at 574-76, 59 L. Ed. 2d at 6-8, 99 S. Ct. at 805-06. Indeed, the parties·extensively argue the applicability of the *Hisquierdo* decision to the facts in the cause before us. Accordingly, a detailed analysis of this decision is appropriate.

In *Hisquierdo*, the Court reversed a decision designating the husband's federal Railroad Retirement Act benefits community property and awarding his soon-to-be ex-wife an interest in his expectation of ultimately receiving these retirement benefits. The Court rejected the wife's community property claim to a portion of the husband's retirement benefits following their divorce, even though his entitlement to these benefits had accrued largely during their married years.

In arriving at this holding, *Hisquierdo* first set forth fundamental principles of federalism. The Court recognized that " '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States.' " *Hisquierdo*, 439 U.S. at 581, 59 L. Ed. 2d at 10-11, 99 S. Ct. at 808, quoting *In re Burrus*, 136 U.S. 586, 593-94, 34 L. Ed. 500, 503, 10 S. Ct. 850, 853 (1890). However, "[o]n the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a

determination whether Congress has 'positively required by direct enactment' that state law be pre-empted." *Hisquierdo*, 439 U.S. at 581, 59 L. Ed. 2d at 11, 99 S. Ct. at 808, quoting *Wetmore v. Markoe*, 196 U.S. 68, 77, 49 L. Ed. 390, 394, 25 S. Ct. 172, 176 (1904). Before a state law governing domestic relations will be overridden, it "must do 'major damage' to 'clear and substantial' federal interests." *Hisquierdo*, 439 U.S. at 581, 59 L. Ed. 2d at 11, 99 S. Ct. at 808, quoting *United States v. Yazell*, 382 U.S. 341, 352, 15 L. Ed. 2d 404, 410, 86 S. Ct. 500, 507 (1966).

*Hisquierdo* found that the case before it presented such a rare situation because it concerned "conflict between federal and state rules for the allocation of a federal entitlement." *Hisquierdo*, 439 U.S. at 582, 59 L. Ed. 2d at 11, 99 S. Ct. at 809. Initially, the Court addressed the question of whether a state court could order the husband to pay his ex-spouse a portion of his retirement benefit as he received it. The Court observed that the Railroad Retirement Act contained a flat prohibition against the attachment of benefits and analogized this provision of the Railroad Retirement Act to the provisions of section 659 of the Social Security Act. Section 659 provided that federal retirement benefits may not be reached to satisfy a "community property settlement, equitable distribution of property, or other division of property between spouses or former spouses" (42 U.S.C. § 659(i)(3)(B)(ii) (2000)). *Hisquierdo* held that ordering a direct beneficiary to pay a portion of the benefit to an ex-spouse would "run contrary to the language and purpose" of the statutes enacted by Congress and would "mechanically deprive" the direct beneficiary of a portion of the benefit that Congress indicated was solely for that beneficiary. *Hisquierdo*, 439 U.S. at 583, 59 L. Ed. 2d at 12, 99 S. Ct. at 809. Applying the preemption doctrine to the facts in *Hisquierdo* "prevents the vagar-

ies of state law from disrupting the national scheme, and guarantees a national uniformity that enhances the effectiveness of congressional policy." *Hisquierdo*, 439 U.S. at 584, 59 L. Ed. 2d at 12, 99 S. Ct. at 810.

The Court explained that allowing state courts to alter the comprehensive federal scheme could do great damage:

> "It is for Congress to decide how these finite funds are to be allocated. The statutory balance is delicate. Congress has fixed an amount thought appropriate to support an employee's old age and to encourage the employee to retire. Any automatic diminution of that amount frustrates the congressional objective. By reducing benefits received, it discourages the divorced employee from retiring. And it provides the employee with an incentive to keep working, because the former spouse has no community property claim to salary earned after the marital community is dissolved. [The federal statute] shields the distribution of benefits from state decisions that would actually reverse the flow of incentives Congress originally intended." *Hisquierdo*, 439 U.S. at 585, 59 L. Ed. 2d at 13, 99 S. Ct. at 810.

Although the wife in *Hisquierdo* argued that the Court's interpretation of the Act was "manifestly unjust," the Court rejected this contention. The Court held that "anti-assignment statutes have substantive meaning" (*Hisquierdo*, 439 U.S. at 586, 59 L. Ed. 2d at 14, 99 S. Ct. at 811), that Congress chose not to make an exception from the antiassignment prohibition for an ex-spouse, and that the wife's argument was one "of equity, not of law." *Hisquierdo*, 439 U.S. at 586, 59 L. Ed. 2d at 14, 99 S. Ct. at 811. The Court thus held that "California must defer to the federal statutory scheme for allocating Railroad Retirement Act benefits insofar as the terms of federal law require." *Hisquierdo*, 439 U.S. at 582, 59 L. Ed. 2d at 11, 99 S. Ct. at 809.

After holding that a direct division of social security benefits violated the nonalienation provisions of the

federal statutory scheme, the *Hisquierdo* Court next considered the argument advanced by the wife that a state court could vindicate her interest and still leave the federal benefit system intact by giving her an offset award of available community property to compensate her for her interest in her ex-husband's expected retirement benefits. In rejecting this argument, the Court provided the following explanation:

"An offsetting award, however, would upset the statutory balance and impair [the ex-husband's] economic security just as surely as would a regular deduction from his benefit check. The harm might well be greater. [The Railroad Retirement Act] provides that payments are not to be 'anticipated.' *** [A] prohibition against anticipation is commonly understood to mean that 'the interest of a sole beneficiary shall not be paid to him before a certain date. *** If that definition is applied here, then the offsetting award respondent seeks would improperly anticipate payment by allowing her to receive her interest before the date Congress has set for any interest to accrue.

Any such anticipation threatens harm to the employee, and corresponding frustration to federal policy, over and above the mere loss of wealth caused by the offset. *** By barring lump sum community property settlements based on mere expectations, the prohibition against anticipation prevents such an obvious frustration of congressional purpose. It also preserves congressional freedom to amend the Act, and so serves much the same function as the frequently stated understanding that programs of this nature convey no future rights and so may be changed without taking property in violation of the Fifth Amendment." *Hisquierdo*, 439 U.S. at 588-90, 59 L. Ed. 2d at 15-16, 99 S. Ct. at 811-12.

The Court concluded that, although it was mindful that "retirement benefits are increasingly important in American life and that divorce is becoming more frequent," the state community property interest sought by the ex-wife conflicted with the federal statutory scheme, diminished that portion of the benefit Congress had

stated should go to the retired worker alone, and threatened to penalize one whom Congress had intended to protect. "It thus causes the kind of injury to federal interests that the Supremacy Clause forbids. It is not the province of state courts to strike a balance different from the one Congress has struck." *Hisquierdo*, 439 U.S. at 590, 59 L. Ed. 2d at 16, 99 S. Ct. at 813.

As stated, it is well settled that the analysis and reasoning employed by the United States Supreme Court in *Hisquierdo* has application to cases, such as that at bar, involving retirement benefits flowing from the Social Security Act. Congress' response to the *Hisquierdo* decision solidifies this proposition. Following *Hisquierdo*, Congress amended the Railroad Retirement Act to allow distribution of certain retirement benefits in state marital dissolution proceedings. Act of Aug. 12, 1983, Pub. L. No. 98—76, title IV, § 419(a)(3), 97 Stat. 438 (codified as amended at 45 U.S.C. § 231m(b)(2)). During the same time frame, Congress also amended the antiassignment provisions of the Social Security Act contained in section 407, creating a new subsection (b). Section 407(b) now provides that "[n]o other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supersede or otherwise modify the provisions of [section 407] except to the extent that it does so by express reference to [section 407]." Act of Apr. 20, 1983, Pub. L. No. 98—21, title III, § 335(a), 97 Stat. 130 (codified as amended at 42 U.S.C. § 407(b)). Thus, the amendment clarified Congress' intent that Social Security benefits remain nonassignable until Congress chooses to modify its position on this issue.

In this court's view, *Hisquierdo* establishes two important points: Social Security benefits may not be divided directly or used as a basis for an offset during state dissolution proceedings. Although the courts in a number of other states have permitted a trial judge to

consider a spouse's anticipated Social Security benefits as one factor, among others, in making an equitable distribution of the distributable marital assets, we reject that analysis. See *In re Marriage of Zahm*, 138 Wash. 2d 213, 978 P.2d 498 (1999) (trial court may consider Social Security benefits for purposes of making equitable distribution of property in dissolution proceeding); *Mahoney v. Mahoney*, 425 Mass. 441, 681 N.E.2d 852 (1997) (trial court could consider anticipated Social Security benefits as a factor in determining an equitable distribution of marital assets); *In re Marriage of Boyer*, 538 N.W.2d 293 (Iowa 1995) (the trial court may consider Social Security benefits in arriving at an equitable distribution of marital assets upon dissolution of marriage); *In re Marriage of Brane*, 21 Kan. App. 2d 778, 908 P.2d 625 (1995) (although antiassignment clause of Social Security Act precludes trial court from dividing Social Security income, trial court may consider Social Security income when dividing marital property); *Eickelberger v. Eickelberger*, 93 Ohio App. 3d 221, 638 N.E.2d 130 (1994) (although future Social Security benefit cannot be divided as a marital asset, it must be evaluated and considered by the trial court in effecting an equitable distribution of the parties' marital assets); *Pleasant v. Pleasant*, 97 Md. App. 711, 720 n.3, 632 A.2d 202, 207 n.3 (1993) (Social Security benefits are not subject to direct distribution in a divorce proceeding; however, in certain situations, "it may be that a court could consider the fact that a party is receiving, or will receive, Social Security benefits, 'as any other factor' in determining whether to make a monetary award"); *Pongonis v. Pongonis*, 606 A.2d 1055 (Me. 1992) (trial court may consider anticipated Social Security benefit as a relevant factor in dividing marital property); *Holland v. Holland*, 403 Pa. Super. 116, 588 A.2d 58 (1991) (divorce court properly considered potential Social Security benefits when awarding portion

of future government pension); *Rudden v. Rudden*, 765 S.W.2d 719 (Mo. App. 1989) (while unassignable as marital or separate property, current or potential Social Security benefits are economic factors to be considered in disposition of marital property). Instructing a trial court to "consider" Social Security benefits, as the appellate court did in this case, either causes an actual difference in the asset distribution or it does not. If it does not, then the "consideration" is essentially without meaning. If it does, then the monetary value of the Social Security benefits the spouse would have received is taken away from that spouse and given to the other spouse to compensate for the anticipated difference. This works as an offset meant to equalize the property distribution. That this type of "consideration" amounts to an offset is recognized in the well-reasoned decisions from other state jurisdictions holding that under *Hisquierdo*, it is improper for a circuit court to consider Social Security benefits in equalizing a property distribution upon dissolution. See *Wolff v. Wolff*, 112 Nev. 1355, 929 P.2d 916 (1996); *Olson v. Olson*, 445 N.W.2d 1 (N.D. 1989); *In re Marriage of Swan*, 301 Or. 167, 720 P.2d 747 (1986).

For example, in *Wolff*, a circuit court judge reduced one spouse's monthly allowance due to her Social Security benefits. Although the circuit judge specifically stated that he was not awarding an offset, the Nevada Supreme Court disagreed. The *Wolff* court explained that "[c]alling a duck a horse does not change the fact that it is still a duck. 'Considering' [the spouse's] social security benefits does not change the fact that this is still an offset, and therefore, error." *Wolff*, 112 Nev. at 1363, 929 P.2d at 921.

We are, however, fully aware of the potential inequities implicated by the federal preemption protection of one spouse's Social Security benefits. Nonetheless, *Hisquierdo* and the federal preemption doctrine compel our

conclusion in this case. It remains a fact that it is not the province of this court—or of any state court—to interfere with the federal scheme, no matter how unfair it may appear to be.

In its opinion in *Hisquierdo*, the United States Supreme Court acknowledged the potential inequity in the federal benefit scheme, and also that its ruling in that case could lead to unfair results. The Court emphasized, however, that unfairness was a consequence of the statutory scheme as enacted by Congress, and that the federal scheme could not be disrupted by state courts:

> "For the present, however, the community property interest that [the ex-spouse] seeks conflicts with [the federal statute], promises to diminish that portion of the benefit Congress has said should go to the retired worker alone, and threatens to penalize one whom Congress has sought to protect. It thus causes the kind of injury to federal interests that the Supremacy Clause forbids. It is not the province of state courts to strike a balance different from the one Congress has struck." *Hisquierdo*, 439 U.S. at 590, 59 L. Ed. 2d at 16, 99 S. Ct. at 813.

Accordingly, it is up to Congress, and not the state courts, to correct any inequity in the federal system.

Other state courts facing the issue of inequity have held that a spouse who participates in a pension system in lieu of Social Security must be placed in a position similar to that of the other spouse whose Social Security benefits will be statutorily exempt from equitable distribution. See *Cornbleth v. Cornbleth*, 397 Pa. Super. 421, 580 A.2d 369 (1990); *Walker v. Walker*, 112 Ohio App. 3d 90, 677 N.E.2d 1252 (1996); *In re Marriage of Kelly*, 198 Ariz. 307, 9 P.3d 1046 (2000). In this case, however, the parties have not argued the applicability of these cases or cited their rationale. Thus, we leave the resolution of that issue for another day.

In sum, the preemption principles animating *Hisquierdo* are equally at issue in the case before us. In drafting the Social Security Act, it is evident that

Congress intended to preempt state law property division schemes as applied to Social Security benefits upon divorce. As stated, in section 402 of the Act, Congress has carefully and deliberately limited a divorced spouse's ability to reach the expected benefits of the other spouse. 42 U.S.C. § 402(b)(1) (2000). By operation of section 402, a divorced spouse may not look to state marital property law for distribution of Social Security benefits. The provisions set forth in section 402, together with the antiassignment provisions contained in sections 407 (42 U.S.C. § 407(a) (2000)) and 659 (42 U.S.C. § 659(a) (2000)) of the Act, reflect the intent of Congress to maintain the federal character of the Social Security system and preempt state interference. Thus, we reverse that portion of the appellate court's order reversing the trial court's division of the parties' retirement benefits.

## B. Reimbursement

The trial court also ordered Patricia to reimburse the marital estate $40,000 in marital funds she used to pay a portion of a loan the parties jointly obtained to build a shed on Patricia's nonmarital property. Again, a trial court's division of marital assets will not be disturbed unless the court clearly abused its discretion. *DeRossett*, 173 Ill. 2d at 422. We note that although the trial court required Patricia to reimburse the marital estate for her $40,000 withdrawal from the parties' joint account, it did not require her to reimburse the marital estate for the additional $2,000 she withdrew, nor did it require Robert to reimburse the marital estate for $8,000 that he withdrew from the same funds.

Section 503(c)(2) of the Illinois Marriage and Dissolution of Marriage Act provides that "[w]hen one estate of property makes a contribution to another estate of property *** the contributing estate shall be reimbursed from the estate receiving the contribution." 750 ILCS

5/503(c)(2) (West 2000). Consistent with our appellate court decisions, we hold that no right to reimbursement arises when the marital estate has already been compensated by its use of the nonmarital property during the marriage.

Illinois courts have previously held that a marital estate is not entitled to reimbursement for mortgage payments toward nonmarital property when the marital estate has already been compensated for its contributions by use of the property during marriage. See, *e.g.*, *In re Marriage of Snow*, 277 Ill. App. 3d 642 (1996); *In re Marriage of Albrecht*, 266 Ill. App. 3d 399 (1994).

In *Snow*, the appellate court held that the marital estate was not entitled to reimbursement of $25,000 contributed to the nonmarital estate through the payment of the mortgage on a nonmarital home because the parties had lived in the nonmarital residence during the time that the contributions were made and, therefore, the marital estate had already been compensated for its contributions. *Snow*, 277 Ill. App. 3d at 650. Similarly, in *Albrecht*, the appellate court held that the trial court must determine whether the marital estate has already been compensated for contributions made to nonmarital property by use of the property during the marriage. *Albrecht*, 266 Ill. App. 3d at 401.

We agree with the appellate court that the marital estate in this case is not entitled to reimbursement. As the appellate court aptly noted:

"The trial court overlooked two important facts when it determined the marital estate was entitled to reimbursement. First, even though the shed is located on [Patricia's] nonmarital property, the debt incurred by the parties for its construction was, and continues to be, a *marital obligation* arising from the farming operation of the parties. Therefore, due to respondent's application of marital funds toward what in fact was a *marital debt*, the trial court's

determination [that] marital funds were transmuted to respondent's nonmarital estate was not entirely correct.

The second fact the trial court overlooked is the substantial compensation the marital estate enjoyed as a result of respondent's nonmarital contributions. *Even if* the trial court's reasoning and calculations were correct and respondent's actions did result in a contribution or a transmutation of $40,000 in marital funds to her nonmarital estate, the marital estate had been more than compensated for this contribution and is, therefore, not entitled to reimbursement." (Emphases in original.) 334 Ill. App. 3d at 388-89.

We agree with the appellate court that the marital estate has reaped the benefit of Patricia's nonmarital contributions in providing the marital estate with a home, free of rent or mortgage payments, and the buildings necessary to sustain a successful farming operation for most of the marriage. The debt on the machine shed was jointly incurred by the parties, as a necessary part of the farming operation, to replace a barn that was used throughout the marriage to store farm equipment. The record indicates that this farming operation provided substantial income to the marital estate. Due to the long duration of the marriage and substantial compensation to the marital estate resulting from Patricia's nonmarital contributions during the marriage, we determine that the appellate court properly found that the marital estate is not entitled to reimbursement. Accordingly, the trial court clearly abused its discretion in requiring Patricia to reimburse the marital estate $40,000, and we affirm the appellate court's order as it pertains to the joint shed loan and the IRS tax obligation.

## III. CONCLUSION

For the above reasons, we reverse that part of the appellate court's judgment reversing the trial court's order concerning division of retirement funds and affirm that part of the appellate court's judgment reversing the trial

456

court's order requiring Patricia to reimburse the marital estate $40,000. The order of the circuit court is similarly affirmed in part and reversed in part.

*Appellate court judgment affirmed in part and reversed in part; circuit court order affirmed in part and reversed in part.*