*In re* MARRIAGE OF KAREN WOJCIK, Petitioner-Appellee, and PAUL WOJCIK, Respondent-Appellant.

Second District    No. 2—04—1076

Opinion filed November 4, 2005.

146

Stephen F. Potts, of Law Offices of Stephen F. Potts, of Oak Brook, for appellant.

Anthony Sammarco, of Law Offices of William J. Stogsdill, Jr., of Wheaton, for appellee.

JUSTICE HUTCHINSON delivered the opinion of the court:

Respondent, Paul Wojcik, appeals from the trial court's judgment dissolving his marriage to petitioner, Karen Wojcik. The trial court awarded 55% of the parties' marital assets to Karen and 45% of those assets to Paul. The trial court also denied Paul's request for an award of maintenance and reserved ruling upon Karen's request for an award of maintenance. On appeal, Paul contends that (1) the trial court's valuation of certain marital assets and its determination of the parties' incomes were against the manifest weight of the evidence; (2) the trial court abused its discretion in finding that Paul's motorcycle was marital property; (3) the trial court erred in considering Paul's receipt of veterans' disability benefits in dividing the marital estate; (4) the trial court abused its discretion in awarding Karen the marital residence and in apportioning the other marital assets; (5) the trial court erred in considering Paul's receipt of veterans' disability benefits when it ruled on his request for maintenance; and (6) the trial court erred in reserving ruling upon Karen's request for maintenance. For reasons that follow, we affirm in part, modify in part, vacate in part, and remand the case for further proceedings.

The parties were married on February 15, 1975. One child, Jeffrey, was born to the marriage in 1984 and is now emancipated. Since their son's birth, the parties resided in the same home in Villa Park. Karen filed her petition for dissolution of marriage on December 2, 2003. Paul filed a counterpetition for dissolution of marriage on December 24, 2003. Each party also petitioned for an award of maintenance. At the time of trial, Karen was 53 years old and Paul was 54 years old.

The following evidence was introduced at trial. Paul served in the military during the Vietnam War between 1970 and 1971. After his discharge from service, Paul graduated from the College of Du Page and began a career in computer processing. In 1986, Paul started his own consulting business, which was called Midwest Software Consultants, Inc. The business was successful and had peak gross earnings in 2001 in excess of $175,000. Following the terrorist attack in New York on September 11, 2001, Paul began to experience heightened panic and encountered difficulties dealing with his business associates. After Paul had an altercation with his largest client, the client canceled its contract, and Midwest Software Consultants, Inc., ceased operations in the summer of 2002. Paul was subsequently diagnosed as suffering from post-traumatic stress disorder and received treatment through the United States Veterans Administration (the VA). In January 2003, the VA adjudicated Paul 70% disabled and unemployable. The VA currently pays Paul monthly disability benefits of $4,000.

Karen worked for various employers throughout the parties' mar-

riage. One of her prior employers was Delta Airlines, and Karen receives a $697 monthly pension from that company. At the time of trial, Karen was employed at Elmhurst College, where she worked full time during the academic school year. Karen's annual salary was $19,620. Karen testified that her monthly paycheck deductions for taxes and insurance would decrease from $638.05 to $483.05 once Paul was removed from her coverage as a dependent.

Prior to trial, the parties stipulated to the value of the following marital assets:

| | |
|---|---|
| Villa Park Trust & Savings Account 1963867 | $58,921.76 |
| Villa Park Trust & Savings Account 10403103 | $63,578.21 |
| CMA Account 56x-11Q55 | $33,870.06 |
| Charter One Account 8885202818 | $52,632.01 |
| Karen's TIAA-CLEF Retirement Account | $14,690.29 |
| Paul's Merrill Lynch Retirement Account | $113,368.37 |
| Karen's IRA Account | $16,269.37. |

The parties also agreed that $28,000 of the funds deposited in Villa Park Trust & Savings account 1963867 was Paul's nonmarital asset. This $28,000 amount represented VA disability benefits that Paul had received since the filing of the dissolution petition. In regard to Villa Park Trust & Savings account 10403103, the parties agreed that certain payments had been made from this account for property taxes and income taxes, thus reducing the account's value to $52,197.54. Both parties also testified that, at the time of trial, the market value of Paul's Merrill Lynch self-employed person (SEP) retirement account had decreased from the stipulated value of $113,368.37 to $92,960. Both parties attributed the decline in value to a downturn in the stock market.

Paul gave testimony concerning other assets that were not a part of the parties' stipulation. Paul testified that the parties jointly owned a 2003 Jeep Cherokee. Paul testified that, according to Edmunds's Used Car Guide, the vehicle had a value of $23,000. Paul also requested that he be awarded his Harley Davidson motorcycle as his nonmarital property. Paul testified that he had purchased the motorcycle in 1999 for $16,000 using money he had inherited from his father in 1998. Paul acknowledged that he deposited his inheritance money in the parties' joint bank account and that the money remained there for several months until he purchased the motorcycle.

Paul also requested the trial court to award him the marital home. Paul testified that he had performed most of the maintenance and

repairs on the interior and exterior of the home. Paul designed and helped build the swimming pool and deck, installed a fence, and had the yard professionally landscaped. Paul also remodeled the basement of the home. Paul testified that he has spent the majority of his time in the marital home since the onset of his disability and that he felt most comfortable there.

During his case, Paul moved the trial court to admit into evidence a copy of the VA's written order adjudicating him to be disabled. Paul argued that the decision was a final administrative decision and requested the trial court to take judicial notice of the order. The trial court denied the motion and explained that it could not take judicial notice of the order because it was not published and accessible to the public. The trial court did allow Paul to include the decision in the trial court record as an offer of proof.

Karen also testified regarding the ownership and value of certain assets held by the parties. She testified that, according to Kelly's Blue Book, the parties' 2003 Jeep Cherokee had a value of $24,000 and the 1999 Harley Davidson motorcycle had a value of $16,000. Karen maintained that both of these vehicles were marital assets. Additionally, Karen asserted that the Mercury Sable that she drove was her own nonmarital property. Karen testified that she purchased the vehicle in 2003 for $22,875 using money that her brother had given to her as a gift. Karen acknowledged that she had deposited the money in the parties' joint bank account prior to purchasing the vehicle. Karen testified that she placed the money in the account simply as a conduit for disbursement of the purchase price. Karen testified that the money was in the parties' joint account for only one day.

Karen requested the trial court to award her the marital home. Karen liked the neighborhood the house was in, and the house was located 15 minutes from her job. Karen testified that she could afford to live in the home because the mortgage was paid and she would have to pay only the property taxes. Karen acknowledged that Paul spent more time in the marital home than she did.

George Pappas testified that he was retained by Karen to appraise the parties' marital home. Pappas prepared a uniform residential appraisal report on January 2, 2004, approximately seven months prior to trial. Pappas testified that he valued the parties' home at $295,000. Pappas indicated that, during the seven-month period between the preparation of the appraisal and trial, favorable market conditions existed and the value of the home might have increased by as much as $8,000.

The parties stipulated to the deposition testimony of Paul's psychiatrist, Dr. Jeffrey Zadecki. Dr. Zadecki testified that he

diagnosed Paul as suffering from post-traumatic stress disorder in September 2002. Dr. Zadecki testified that, as of the time of trial, Paul's disorder continued to be severe and his social functioning was worsening. To treat the symptoms of his disorder, Dr. Zadecki prescribed various medications for Paul including Prozac, Wellbutrin, Clonazepam, and Sertraline. Dr. Zadecki opined that Paul's condition was chronic and that he would continue to encounter severe difficulty in functioning in occupational and social roles. Dr. Zadecki also opined that Paul would not be able to pursue any gainful employment because of his disability. On cross-examination, Dr. Zadecki testified that Paul's prognosis was "not absolutely pessimistic" and that Paul might eventually be able to function sufficiently to be self-employed. However, Dr. Zadecki opined that it was unlikely that Paul would be able to be effective in a work environment.

On September 14, 2004, the trial court issued a written memorandum of its findings. The trial court valued the Mercury Sable at $16,000 and awarded it to Karen as her nonmarital property. The trial court also found that $28,000 of the funds deposited in Villa Park Trust & Savings account 1963867 represented VA disability benefits that Paul had received since the commencement of the dissolution proceeding, and it awarded this amount to Paul as his nonmarital property. The trial court found that the remainder of the parties' assets were marital; it then valued and divided those assets as follows:

|  | Karen | Paul |
|---|---|---|
| Marital Home | $295,000 | |
| Villa Park Trust & Savings Account 10403103 | 15,600 | $36,597 |
| Villa Park Trust & Savings Account 1963867 | | 30,928 |
| CMA Account 56x-11Q55 | | 33,870 |
| Charter One Account 885202818 | | 52,632 |
| Karen's TIAA-CLEF Retirement Account | 14,690 | |
| Paul's Merrill Lynch SEP Retirement Account | 15,000 | 98,368 |
| Karen's IRA Account | 16,269 | |
| 2003 Jeep Cherokee | | 24,000 |
| 2000 Harley Davidson motorcycle | | 16,000 |
| TOTAL | $356,559 | $292,395. |

In dividing the marital assets, the trial court indicated that its intent was to "as closely as possible arrive at a 50/50 distribution of the marital estate with any discrepancies in that accounted for by the larger non-marital estate awarded to [Paul]." The trial court also specifically stated that it had not considered Paul's disability benefits "as a set off *** in its division of marital assets."

In considering the parties' respective requests for maintenance, the trial court found that Karen was employed and earned approximately $19,200 annually. The trial court also found that respondent was disabled and received $51,000 annually in VA disability benefits. The trial court indicated that, "[b]ased upon the recent Supreme Court case of *In re Marriage of Crook*, [211 Ill. 2d 437 (2004)], the Court is not considering [Paul's] disability benefits as *** a basis to require him to pay maintenance." The trial court found that Paul was unable to pay maintenance. However, based upon Dr. Zadecki's testimony, the trial court found that there was a possibility that Paul's disability would subside sufficiently to permit him to return to employment. Thus, the trial court reserved the issue of Paul's payment of maintenance to Karen and ordered Paul to provide Karen on an annual basis an "updated report relative to his continued disability."

The trial court denied Paul's request to receive maintenance from Karen. The trial court found that the decision in *Crook* did not preclude it from considering the fact that Paul received in excess of $51,000 annually in VA disability benefits. The trial court found that these benefits would be sufficient to pay for his living expenses. Additionally, the trial court found, "based upon testimony as to [Karen's] income and expenses, that she is not able to contribute to the maintenance of [Paul] even if the Court would consider that [Paul] had no other means to provide for his own needs."

On September 30, 2004, the trial court entered its final judgment consistent with its written memorandum. Paul subsequently filed a timely notice of appeal.

We first consider Paul's contention that the trial court's valuation of certain marital assets and its determination of the parties' incomes were against the manifest weight of the evidence. Specifically, Paul argues that the trial court erred in valuing his SEP retirement account and the parties' marital residence. Paul also contends that the trial court's findings that Karen had $19,200 in annual income and that he had $51,000 in annual income were against the manifest weight of the evidence.

■ The valuation of marital assets in a dissolution of marriage

proceeding is a question of fact that will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 349 (1983). Generally, marital assets are to be valued at the time the dissolution judgment is entered. *In re Marriage of Weiler*, 258 Ill. App. 3d 454, 460-61 (1994). It is permissible for a trial court to value the assets as of the date of trial, if that date is not too far removed from the entry of the dissolution judgment. *In re Marriage of Benkendorf*, 252 Ill. App. 3d 429, 443 (1993).

■ In the dissolution judgment, the trial court valued Paul's SEP retirement account at $113,368.37, which was the value stipulated by the parties as of June 30, 2004. During the August trial, however, both parties testified that the value of this account had diminished to $92,960 due to a downturn in the stock market. Although the parties had stipulated to the higher value, the trial court should have rejected the stipulation in light of the undisputed evidence that the asset had significantly decreased in value. See *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 479 (1996) (noting that stipulations are not necessarily conclusive and that trial court has discretion to reject stipulation to further the ends of justice). In light of the undisputed evidence that the value of the SEP account at the time of dissolution was $92,960 rather than the stipulated value of $113,368.37, we conclude that the trial court's valuation of this asset was against the manifest weight of the evidence. We will consider the effect that this improper valuation had upon the trial court's division of marital assets below.

■ We next consider the valuation of the marital home. In the dissolution judgment, the trial court valued the home at $295,000 which was the valuation given by Pappas in his Januai 2004 apprais: Paul argues that the trial court's valuation failed to take into accoi it the appreciation in value between the appraisal and the August 2004 trial. We disagree. Our review of the record reveals that there was no credible evidence of appreciation between the time of the appraisal and trial. Although Pappas testified that the value of the marital home had likely increased by $8,000, he explained that such a figure was "pure speculation" and not the result of any detailed market analysis or inspection of the home. In light of Pappas's testimony that any estimate of the appreciation in value of the home since the time of the appraisal would be speculative, we do not believe that the trial court's use of January 2004 appraisal as its valuation of the marital home was improper. See *In re Marriage of Sanborn*, 78 Ill. App. 3d 146, 150 (1979) (noting that courts ordinarily refrain from taking notice that

inflation has caused a residence to appreciate in value because many different factors may affect such value). Therefore, we conclude that its finding as to the value of the martial home was not against the manifest weight of the evidence.

■ Paul also disputes the trial court's findings as to the parties' annual incomes. Paul argues that Karen's net annual income was actually $22,187.40 as opposed to the $19,200 annual income found by the trial court. Paul also argues that his net annual income was actually $48,000 as opposed to the $51,000 annual income found by the trial court. On review, we will not set aside such factual findings unless they are clearly against the manifest weight of the evidence. *In re Marriage of Swigers*, 176 Ill. App. 3d 795, 801 (1988).

A review of the record supports Paul's arguments that the trial court's findings as to the parties' incomes were erroneous. Karen testified that she received $19,620 in salary annually from her position at Elmhurst College, from which $5,796 was deducted for taxes and insurance coverage. Karen also testified that she received $8,364 annually in pension payments from Delta Airlines. When combined, Karen's annual income from all sources was $22,188 as opposed to the $19,200 found by the trial court. Meanwhile, prior to trial, the parties stipulated that Paul's income consisted of $4,000 per month in benefits. Thus, Paul's annual income was $48,000 as opposed to the $51,000 found by the trial court. In her appellate brief, Karen does not dispute Paul's argument that the trial court's findings as to the parties' incomes were erroneous.

We conclude, however, that the effect of such erroneous findings was harmless. As we will discuss more fully below, the trial court's written memorandum findings indicated that it had endeavored to split the marital property evenly and did not specifically mention the parties' respective incomes in dividing the marital estate. Although the trial court undoubtedly considered the parties' incomes as a factor in dividing the marital assets (see 750 ILCS 5/503(d)(8) (West 2004)), we do not believe that the trial court's property division would have been any different had it considered the correct income amounts. As noted above, Karen's income was actually $3,000 greater than the number used by the trial court and Paul's income was $3,000 less than the number used by the trial court. We do not believe that these minor discrepancies would have altered the trial court's clearly expressed intention to divide the marital estate equally. See *Wilder*, 122 Ill. App. 3d at 344-45 (noting that a trial court's error warrants reversal only where a party has been prejudiced or it appears that the outcome might have been different had the error not occurred).

Additionally, we do not believe that these discrepancies would have had any impact upon the trial court's maintenance determination. The trial court found that Karen did not earn sufficient income to pay maintenance to Paul and denied Paul's request for maintenance. Whether Karen earned $22,000 or $19,000, the evidence clearly demonstrated that her income did not meet her own expenses and that she was not in a position to pay maintenance to Paul. Meanwhile, the trial court specifically indicated that it would not consider Paul's disability income in ruling upon Paul's request for maintenance; thus, whether Paul received $51,000 or $48,000 in disability benefits would have had no impact upon the trial court's maintenance determination. Although we will later consider the question of whether a trial court may consider a party's receipt of veterans' disability income in making a maintenance award, we conclude the trial court's erroneous findings as to the parties' incomes were harmless because they had no impact upon the resolution of the issues before it. See *Wilder*, 122 Ill. App. 3d at 344-45.

■ Paul next contends that the trial court abused its discretion in classifying his Harley Davidson motorcycle as marital property. Paul argues that the trial testimony established that he had purchased the motorcycle with an inheritance he had received from his father's estate.

Prior to dividing the parties' property upon dissolution of marriage, the trial court must classify the property as either marital or nonmarital. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000). The trial court's classification will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *Didier*, 318 Ill. App. 3d at 258. Section 503(b)(1) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/503(b)\ l) (West 2004)) contains a presumption that all property acquired by either spouse after the date of marriage but before the entry of judgment of dissolution is marital property, regardless of how title is held. The presumption can be overcome only with a showing, by clear and convincing evidence, that the property falls within one of the statutory exceptions listed in section 503(a) of the Act. 750 ILCS 5/503(a) (West 2004). One such exception is where the property has been acquired by gift, legacy, or descent. 750 ILCS 5/503(a)(1) (West 2004). The failure to properly segregate nonmarital property, by commingling it with marital property, evinces an intent to treat the former as part of the marital estate. *In re Marriage of Johnson*, 106 Ill. App. 3d 502, 510 (1982). Any doubts as to the nature of the property are resolved in favor of finding that the

property is marital. *In re Marriage of Hegge*, 285 Ill. App. 3d 138, 141 (1996).

After reviewing the record in the instant case, the trial court's classification of the Harley Davidson motorcycle as marital property was not against the manifest weight of the evidence. The trial evidence established that, sometime during 1998, Paul inherited money from his father's estate. At the time he initially received the inheritance, there is no question that the property was nonmarital. 750 ILCS 5/503(a)(1) (West 2004). However, after receiving this money, Paul deposited it into a bank account jointly held by the parties. Apparently, the funds were then transferred between various accounts and certificates of deposit. Paul testified that he was not sure whether the original account that he deposited the money into was still open at the time of trial. Paul testified that, several months after receiving the inheritance, he purchased the motorcycle. Although Paul testified that he believed that he had used the inheritance money to purchase the motorcycle, Paul introduced no documentary evidence to show that the specific funds inherited were segregated and ultimately used for the purchase. As Paul had the burden to prove that the motorcycle was nonmarital, it was incumbent upon him to establish that he did not intend to make a gift to the marital estate at the time he deposited the inheritance into the parties' joint checking account. See *Hegge*, 285 Ill. App. 3d at 141. Given the length of time that the money was in the marital accounts prior to the purchase, and in light of Paul's inability to specifically trace the assets used for the purchase, we cannot say that the trial court's classification of the motorcycle as marital property was against the manifest weight of the evidence.

In reaching this conclusion, we are unpersuaded by Paul's argument that the process that he used to purchase the motorcycle was the same process used by Karen when she purchased her Mercury Sable, which the trial court classified as nonmarital property. Karen testified that she purchased the Mercury Sable with money that she had received as a gift from her brother. Although Karen placed the money in the parties' joint account prior to purchasing the vehicle, Karen testified that the funds were in the parties' joint account for only one day and that she had placed the funds in the account merely as a conduit to transfer the money. Based upon such evidence, the trial court could have reasonably concluded that Karen had established by clear and convincing evidence that she had not intended to make a gift to the marital estate of the money her brother had given her.

We next consider Paul's contention that the trial court erred in considering his receipt of VA disability benefits in resolving the

property issues presented in the dissolution proceeding. Paul argues that, under the principles articulated in *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 59 L. Ed. 2d 1, 99 S. Ct. 802 (1979), and in *Crook*, it is improper for an Illinois trial court to consider nonassignable federal benefits as a factor in resolving property issues under the Act. Paul argues that the trial court improperly considered his nonmarital VA disability benefits in deciding to award Karen a larger share of the marital estate.

In *Hisquierdo*, the United States Supreme Court reversed a decision designating the former husband's federal railroad retirement benefits as community property and awarding the former wife an interest in those benefits. The Court explained that, although the subject of domestic relations generally belongs to the states, in an instance where state family law directly conflicts with a federal statute, the federal statute preempts the state law under the supremacy clause of the federal constitution. *Hisquierdo*, 439 U.S. at 581, 59 L. Ed. 2d at 11, 99 S. Ct. at 808, citing *Wetmore v. Markoe*, 196 U.S. 68, 77, 49 L. Ed. 390, 394, 25 S. Ct. 172, 176 (1904). The Court found that such a conflict existed between federal and state rules for the allocation of federal railroad retirement benefits. The Court noted that the Railroad Retirement Act of 1974 (45 U.S.C. § 231 *et seq.* (1976)) required that all federal retirement benefits be paid solely to the beneficiary and contained an absolute prohibition against the assignment or attachment of benefits. *Hisquierdo*, 439 U.S. at 576, 59 L. Ed. 2d at 7, 99 S. Ct. at 805, quoting 45 U.S.C. § 231m (1976). The Court thus held that state courts were preempted from apportioning federal railroad retirement benefits or making an offsetting award of property to compensate for the payment of such benefits. *Hisquierdo*, 439 U.S. at 584, 59 L. Ed. 2d at 12, 99 S. Ct. at 810. The Court explained that consideration and division of such benefits would require the improper "anticipation" that such benefits would be received before Congress had budgeted money for their payment. The Court noted that Congress has finite funds and might choose to eliminate certain benefits in the future. *Hisquierdo*, 439 U.S. at 589, 59 L. Ed. 2d at 15-16, 99 S. Ct. at 812.

In *Crook*, 211 Ill. 2d 437, our supreme court considered whether an Illinois trial court could consider federal Social Security benefits in determining the division of assets in a marital dissolution proceeding. The supreme court held that a trial court in a dissolution of marriage action properly refused to consider the husband's anticipated Social Security benefits in dividing the parties' marital estate. *Crook*, 211 Ill. 2d at 453. The supreme court noted that section 407(a) of the Social

Security Act (42 U.S.C. § 407(a) (2000)) contained a provision, similar to section 231m of the Railroad Retirement Act of 1974, that prohibited a beneficiary from transferring or assigning his or her benefits to another. *Crook*, 211 Ill. 2d at 443. The supreme court then applied the analysis and reasoning employed in *Hisquierdo* to conclude that Social Security benefits may not be divided directly or used as a basis for an offset during marital dissolution proceedings. *Crook*, 211 Ill. 2d at 449. The supreme court also rejected the approach of a number of other state courts that have permitted a trial judge to consider a spouse's anticipated Social Security benefits as a factor in making an equitable division of the distributable marital assets. *Crook*, 211 Ill. 2d at 449-51.

The question presented in the instant case is whether federal law preempts a trial court from considering a spouse's VA disability benefits in resolving the property issues in a dissolution proceeding. Section 5301(a)(1) of Title 38 of the United States Code (Veterans' Benefits) contains a prohibition against the transfer and assignment of present and future VA disability benefits that is similar to those provisions in the Railroad Retirement Act of 1974 and Social Security Act described above. See 38 U.S.C.A. § 5301(a)(1) (West Supp. 2004). That section provides:

> "Payments of benefits due or to become due under any law administered by the Secretary shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary." 38 U.S.C.A. § 5301(a)(1) (West Supp. 2004).

The parties agree that such statutory authority, when considered in light of the *Hisquierdo* and *Crook* cases, prohibits an Illinois trial court from dividing present or future VA disability benefits as a marital asset or using those benefits as a basis for an offset in awarding the marital property.

Although the United States Supreme Court has never directly considered the question before us, it did tangentially address the issue in *Mansell v. Mansell*, 490 U.S. 581, 104 L. Ed. 2d 675, 109 S. Ct. 2023 (1989). In that case, a California state court enforced a marital settlement agreement in which the former husband agreed to pay 50% of his military retirement benefits to his former wife. A portion of these benefits included disability benefits that the former husband had received after waiving a portion of his retirement pay. On appeal, the

former husband argued that federal law precluded a state court from treating as community property military retirement pay that had been waived to receive disability benefits. In its decision, the Supreme Court did not directly discuss the anti-attachment provisions of section 5301(a)(1) quoted above. Instead, the Supreme Court predicated its analysis upon a construction of the Uniformed Services Former Spouses' Protection Act (10 U.S.C. § 1408 (1982 and Supp. V 1987)), which authorized state courts to treat "disposable retired or retainer pay" as community property. *Mansell*, 490 U.S. at 584-87, 104 L. Ed. 2d at 682-84, 109 S. Ct. at 2026-28. The Supreme Court held that the Uniformed Services Former Spouses' Protection Act did not grant state courts the power to treat as property divisible upon divorce military retirement pay waived by the retiree in order to receive veterans' disability benefits. *Mansell*, 490 U.S. at 594-95, 104 L. Ed. 2d at 688-89, 109 S. Ct. at 2031-32. Implicit within this holding was the principle that disability benefits are not subject to division as part of a dissolution proceeding. See *Mansell*, 490 U.S. at 603-04, 104 L. Ed. 2d at 694-95, 109 S. Ct. at 2036-37 (O'Connor, J., dissenting, joined by Blackmun, J.) (noting that the anti-attachment provisions of 38 U.S.C. § 5301(a) protect a spouse's VA disability benefits from attack in a dissolution proceeding).

Our research has uncovered one Illinois decision addressing the question of whether military disability benefits are marital assets subject to division in a dissolution proceeding. See *In re Marriage of Hapaniewski*, 107 Ill. App. 3d 848 (1982). In *Hapaniewski*, the reviewing court considered the former husband's argument that the trial court had violated federal law when it awarded his former wife additional marital property as an offset to his military disability benefits. After examining the legislative history of the veterans' disability compensation program, the reviewing court explained that the purpose of the program was to provide relief from the impaired earning capacity of veterans disabled as the result of their military service. *Hapaniewski*, 107 Ill. App. 3d at 852. Relying on this legislative history and *Hisquierdo*, the reviewing court held that the classification of VA disability benefits as marital property would diminish the benefits that Congress has determined should go to the veteran and would cause an injury to federal interests that is forbidden by the supremacy clause. *Hapaniewski*, 107 Ill. App. 3d at 852. After reviewing the record, the reviewing court concluded that the trial court had not classified the husband's disability benefits as marital property and had not awarded the wife a disproportionate share of the marital property as an offset

to her interest in the husband's disability benefits. *Hapaniewski*, 107 Ill. App. 3d at 852.

Courts of other states have also concluded that federal law preempts a state court from dividing a spouse's present or future VA disability benefits during a dissolution proceeding. See, *e.g., In re Marriage of Howell*, 434 N.W.2d 629 (Iowa 1989); *Ex parte Johnson*, 591 S.W.2d 453 (Tex. 1979); *Perkins v. Perkins*, 107 Wash. App. 313, 26 P.3d 989 (2001). Relying on *Hisquierdo* and section 5301(a)(1), these courts have found that the payment of disability benefits is not an earned property right accrued out of specific terms of service but is instead a benefit of employment that may be withdrawn at any time and under any condition that Congress may choose. *Johnson*, 591 S.W.2d at 455. As such, the recipients of such benefits have no vested right in their continuing receipt. *Johnson*, 591 S.W.2d at 455. After comparing the federal statutory prohibitions against the attachment of both disability benefits and railroad retirement benefits, these courts have concluded that the division of anticipated VA disability benefits conflicted with the clear intent of Congress that the benefits be solely for the use of the disabled veteran. *Johnson*, 591 S.W.2d at 456; *Perkins*, 107 Wash. App. at 318-21, 26 P.3d at 992-93.

After reviewing these authorities, and in light of our supreme court's analysis in *Crook*, we agree with the parties that the supremacy clause of the federal constitution precludes Illinois trial courts from dividing present or anticipated VA disability benefits as a marital asset or using those benefits as a basis for an offsetting award of the marital property. We believe that the anti-attachment provision contained in section 5301(a)(1) is indistinguishable from the anti-attachment provisions contained in the Railroad Retirement Act of 1974 and the Social Security Act discussed in *Hisquierdo* and *Crook*. Under these provisions, Congress expressed its direct intent that benefits paid pursuant to these programs are not subject to any legal process. See *Crook*, 211 Ill. 2d at 448-49. Thus we conclude that VA benefits may not be divided directly or used as a basis for an offset during state dissolution proceedings.

Here, the trial court clearly did not characterize Paul's present and anticipated VA disability benefits as marital property and did not award Karen a disproportionate share of the martial estate as an offset for Paul's receipt of such benefits. Moreover, the trial court characterized as Paul's nonmarital property the $28,000 in VA benefits that Paul had already been paid following the commencement of the dissolution proceedings and placed in the parties' joint banking account number 1963867 at Villa Park Trust & Savings. Such rulings

were certainly in accordance with federal and state law principles discussed above.

Paul specifically objects to the trial court's comment in its written memorandum order that it "was the Court's intent to as closely as possible arrive at a 50/50 distribution of the entire marital estate with any discrepancies in that accounted for by the larger non-marital estate awarded to [Paul]." Paul argues that, since the entirety of his nonmarital assets consisted of VA disability benefits that he had received, the trial court effectively awarded Karen a larger share of the marital estate as an offset for his disability benefits.

We find no impropriety in the trial court's statement. Initially, we note that the trial court specifically expressed its intent that each party receive approximately one-half of the marital assets. The trial court made this determination without any consideration of Paul's accumulated disability benefits. It is apparent from the trial court's own written findings that it did not intend to award Karen a greater share of the marital property as a result of Paul's receipt or accumulation of disability benefits. In dividing the marital estate, however, the trial court noted that it was difficult to achieve precisely equal shares. The trial court indicated that, to the extent that the shares were unequal, it would award the larger share to Karen because Paul had greater nonmarital assets. The trial court certainly had the statutory authority to make such an award under section 503(d)(3) of the Act (750 ILCS 5/503(d)(3) (West 2004)), which directs the trial court to consider "the value of the property assigned to each spouse" in dividing the marital property. In accordance with section 503(d)(3), Paul's accumulation of disability benefits, as nonmarital property set aside to him, was a proper factor for the trial court to consider in the division of the marital property. See *Hapaniewski*, 107 Ill. App. 3d at 853.

We also do not believe that the trial court's consideration of Paul's accumulated disability benefits ran afoul of the anti-attachment provisions of section 5301(a)(1). Those anti-attachment provisions speak to the "payment of benefits due or to become due" to a veteran. 38 U.S.C.A. § 5301(a)(1) (West Supp. 2004). In other words, the federal statute prohibits the assignment or attachment of *present* or *anticipated* disability benefit payments. See generally *Crook*, 211 Ill. 2d at 449-50 (holding that a trial judge should not consider a spouse's *anticipated* Social Security benefits as a factor in distributing the marital assets). Indeed, all of the cases discussing the effect of section 5301(a) upon local domestic relations law relate only to the treatment and consideration of present or anticipated disability benefits. See *Johnson*, 591 S.W.2d at 455; *Perkins*, 107 Wash. App. at 315, 26 P.3d at

990. As noted above, the prohibition against the consideration of the receipt of present or future benefits avoids speculative anticipation that Congress will continue to pay the benefits in the future. See *Hisquierdo*, 439 U.S. at 589, 59 L. Ed. 2d at 15-16, 99 S. Ct. at 812.

■ In the instant case, the trial court did not consider Paul's present or future disability benefits in dividing the marital assets. Instead, the trial court simply noted that Paul had already received and accumulated $28,000 in disability benefits that had been deposited in the parties' Villa Park Trust & Savings account. Although such assets may have been protected from creditors under the provisions of section 5301(a)(1) (see *Porter v. Aetna Casualty & Surety Co.*, 370 U.S. 159, 8 L. Ed. 2d 407, 82 S. Ct. 1231 (1962)), that statutory authority did not preclude the trial court from acknowledging the existence of such funds as being available to Paul as nonmarital property. Thus, in making the determination of whether Karen or Paul should receive a larger share of the marital estate, we do not believe that the trial court erred in considering, pursuant to section 503(d)(3) of the Act, that Paul had a greater amount of nonmarital assets available for his own maintenance and support.

■ We next consider Paul's contention that the trial court abused its discretion in dividing the marital assets. Paul argues that he was entitled to more than half of the marital estate because he made a greater contribution toward the acquisition and preservation of the marital assets. Paul also argues that the trial court should have awarded him a greater share of the marital assets because he was disabled and unemployable, while Karen was healthy and employed. Paul also argues that the trial court abused its discretion in awarding Karen the marital residence. Finally, Paul argues that the trial court's actual division of the marital assets was not equal and that Karen received a significantly larger share.

As Paul acknowledges, the trial court has broad discretion in the division of marital assets. *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1113 (2004). We will reverse a trial court's division only where it constitutes an abuse of discretion. *Sawicki*, 346 Ill. App. 3d at 1113. An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *Sawicki*, 346 Ill. App. 3d at 1113.

Here, the trial court indicated that it had endeavored to apportion the martial estate equally between the parties. The trial court explained, however, that an exact split was difficult and that the marital shares were not exactly equal. The trial court awarded Karen $356,559, which was 55% of the marital estate, and awarded Paul

$296,395, which was 45% of the marital estate. As noted above, the trial court explained that it had awarded Karen the larger share because Paul had greater nonmarital assets.

We have reviewed the factors under section 503(d) of the Act that are relevant to this case and conclude that the trial court did not abuse its discretion in the manner it divided the marital estate. Contrary to Paul's assertions, we believe that both parties contributed to the acquisition of the marital property over their lengthy marriage. See 750 ILCS 5/503(d)(1) (West 2004). Although Karen did not earn as much income as Paul during most of the marriage, the evidence established that Karen worked throughout the marriage and contributed toward the acquisition of the marital property. We also believe that the trial court's distribution of the marital assets was reasonable after considering the economic circumstances of the parties (750 ILCS 5/503(d)(5) (West 2004)), as well as the age, health, occupation, sources of income, and employability of the parties (750 ILCS 5/503(d)(8) (West 2004)). The parties are of a similar age and their economic circumstances, although different, are comparable. Although Karen is in good health and employed, her annual income was only approximately $22,000 and there was no evidence that she had the potential to earn significantly more. The evidence established that Karen's income was not sufficient to meet her needs. The evidence also established that Paul was disabled and was not presently earning any income from employment. Based upon such evidence, we believe that the trial court could have reasonably concluded that both parties needed significant marital assets to sustain themselves. In light of the fact that Paul had greater nonmarital assets, we conclude that the trial court's decision to award Karen a larger percentage of the marital estate was not an abuse of discretion. See *In re Marriage of Henke*, 313 Ill. App. 3d 159, 175 (2000) (stating that trial court must make an equitable distribution but that the distribution need not be "equal").

In so holding, we note that the trial court took great pains to indicate that it had not considered Paul's disability benefits in its division of the marital estate, and we believe that its property division evidences that it did not, in fact, do so. Indeed, had it been permissible to consider Paul's receipt of disability benefits, we believe that the trial court could have awarded a significantly larger share of the marital estate to Karen to offset the discrepancy in the parties' income. The trial court, however, did not do so, and we believe that its ruling is in conformity with the principles articulated in *Hisquierdo* and *Crook*.

Paul also argues that the trial court abused its discretion in

awarding the marital residence to Karen. The trial court's award of the marital residence, as with other matters relating to the division of the marital property, is reviewed under an abuse-of-discretion standard. *In re Marriage of Caldwell*, 124 Ill. App. 3d 898, 900-02 (1984). Here, both parties presented the trial court with compelling reasons why they wished to be awarded the marital residence. Paul testified that he felt comfortable in the residence and the neighborhood and that this comfort level was important in coping with his post-traumatic stress disorder. Paul had also provided much of the labor to improve the residence. Meanwhile, Karen testified that she also liked the home and the neighborhood and that she could afford to live in the home because the mortgage had already been paid in full. Under circumstances where the trial court is presented with valid reasons to award the marital home to either party, we will not second-guess the trial court's ruling. Given Karen's limited financial resources, we cannot say that the trial court abused its discretion in awarding the marital residence to her.

We next consider the effect of the trial court's overvaluation of Paul's SEP retirement account upon the division of the marital assets. As noted above, the value of Paul's SEP account at the time of trial was $92,960, which was $20,408 less than the value placed upon it by the trial court. Subtracting this amount, the total marital estate was $628,546. Using the 55/45 percentages ordered by the trial court, Karen was entitled to receive $345,700.30 of the marital estate and Paul was entitled to receive $282,845.70 of the marital estate. In order to achieve such a division, and to avoid additional litigation between the parties, we modify the trial court's dissolution order as it relates to the division of Paul's SEP retirement account. See 155 Ill. 2d R. 366(a); *In re Marriage of Grunsten*, 304 Ill. App. 3d 12, 18, 22 (1999). We award $4,141.30 of the account to Karen and $88,818.70 of the account to Paul. We affirm the remainder of the trial court's property division.

We next consider the propriety of the trial court's ruling on the issue of maintenance. Paul initially contends that the trial court erred in denying his request for maintenance from Karen. Paul argues that, in denying his request, the trial court improperly considered his receipt of VA disability benefits. Specifically, the trial court found that Paul received disability payments that were sufficient to pay for his monthly living expenses. The trial court stated that, while "the *Crook* case may under certain circumstances result in inequities, as commented on by the Illinois Supreme Court, there is no reason for this Court to seek inequities by ignoring the reality of the benefits received by [Paul] on

the issue of his right to receive maintenance from [Karen]." Paul argues that the trial court's consideration of his receipt of disability benefits in ruling upon his petition for maintenance violated federal preemption principles.

Paul's contention lacks support in the governing case law, which has held that federal preemption principles do not preclude a state court from ordering a veteran to pay court-ordered family support obligations from disability benefits. In *Rose v. Rose*, 481 U.S. 619, 95 L. Ed. 2d 599, 107 S. Ct. 2029 (1987), a disabled veteran, whose main source of income was veterans' disability benefits, was held in contempt by a Tennessee trial court for failing to pay child support. The veteran's child support obligation had been fixed by the state trial court after considering the veterans' disability benefits as income under a Tennessee statute. *Rose*, 481 U.S. at 621-22, 95 L. Ed. 2d at 605, 107 S. Ct. at 2031-32. The United States Supreme Court ruled that the Tennessee court had jurisdiction to hold a veteran in contempt for failing to pay child support, even if the veteran's only means of satisfying the obligation was to utilize his veterans' disability benefits received from the government. *Rose*, 481 U.S. at 636, 95 L. Ed. 2d at 614, 107 S. Ct. at 2039. The Court held that the Tennessee court's consideration of the veterans' disability benefits in fixing the child support award was not preempted by section 5301(a)(1)'s anti-attachment provision. *Rose*, 481 U.S. at 634, 95 L. Ed. 2d at 613, 107 S. Ct. at 2038. In reaching this conclusion, the Court reviewed the legislative history of the provision, commenting:

> "Though the legislative history for this provision is also sparse, it recognizes two purposes: to 'avoid the possibility of the Veterans' Administration . . . being placed in the position of a collection agency' and to 'prevent the deprivation and depletion of the means of subsistence of veterans dependent upon these benefits as the main source of their income.' [Citation.] Neither purpose is constrained by allowing the state court in the present case to hold appellant in contempt for failing to pay child support. The contempt proceeding did not turn the Administrator into a collection agency; the Administrator was not obliged to participate in the proceeding or to pay benefits directly to appellee. Nor did the exercise of state-court jurisdiction over appellant's disability benefits deprive appellant of his means of subsistence contrary to Congress' intent, for those benefits are not provided to support appellant alone.
>
> Veterans' disability benefits compensate for impaired earning capacity [citation], and are intended to 'provide reasonable and adequate compensation for disabled veterans *and their families.*'

[Citation.]" (Emphasis in original.) *Rose*, 481 U.S. at 630, 95 L. Ed. 2d at 610, 107 S. Ct. at 2036.

The Court found that family support obligations are "deeply rooted moral responsibilities" that are distinct from the division of community or marital property, which is "more akin to an amoral business relationship." *Rose*, 481 U.S. at 632, 95 L. Ed. 2d at 611, 107 S. Ct. at 2037. The Court thus concluded that the anti-attachment provisions of section 5301(a)(1) did not extend to protect a veteran's disability benefits from seizure where the veteran invokes that provision to avoid an otherwise valid order of support. *Rose*, 481 U.S. at 634, 95 L. Ed. 2d at 613, 107 S. Ct. at 2038.

In conformity with the principles articulated in *Rose*, the reviewing courts of numerous other states have held that a trial court may properly treat a veteran's present and future disability benefits as income in determining the veteran's obligation to pay alimony or maintenance. See *Allen v. Allen*, 650 So. 2d 1019, 1019 (Fla. App. 1994); *In re Marriage of Anderson*, 522 N.W.2d 99, 101-02 (Iowa App. 1994); *Steiner v. Steiner*, 788 So. 2d 771, 777-78 (Miss. 2001); *Repash v. Repash*, 148 Vt. 70, 72-73, 528 A.2d 744, 745 (1987); *In re Marriage of Weberg*, 158 Wis. 2d 540, 543-45, 463 N.W.2d 382, 383-84 (App. 1990). These courts have held that the anti-attachment provisions of section 5301(a)(1) do not shield a veteran's benefits from being considered in an alimony or maintenance proceeding because a spouse seeking maintenance is not a "creditor" under the statute but is instead seeking family support. See *Anderson*, 522 N.W.2d at 102; *Repash*, 148 Vt. at 72, 528 A.2d at 745.

Although no Illinois court has considered the precise question of whether a trial court may consider a spouse's receipt of veterans' disability benefits in ruling upon a petition for maintenance, our research has revealed two cases that provide guidance on the issue. In *In re Marriage of Pope-Clifton*, 355 Ill. App. 3d 478 (2005), the former husband appealed from a trial court's judgment that his bank account containing only funds received as veterans' disability benefits was not exempt from collection to pay a judgment for child support and maintenance. On appeal, the former husband argued that the funds in his bank account were exempt from collection under the anti-attachment provisions of section 5301(a)(1). *Pope-Clifton*, 355 Ill. App. 3d at 482. Relying on *Rose*, the reviewing court rejected this argument and held that the funds were not exempt from seizure under federal law. *Pope-Clifton*, 355 Ill. App. 3d at 482. The reviewing court explained that veterans' benefits were not for the sole benefit of the disabled veteran, but were intended to provide reasonable and

adequate compensation for the veteran and the veteran's family. *Pope-Clifton*, 355 Ill. App. 3d at 482, quoting *Rose*, 481 U.S. at 630, 95 L. Ed. 2d at 610, 107 S. Ct. at 2036.

In *In re Marriage of Rogers*, 352 Ill. App. 3d 896 (2004), an Illinois court considered whether a spouse's receipt of Social Security benefits could be considered by a trial court in calculating a maintenance award. After considering *Crook* and *Hisquierdo*, the reviewing court in *Rogers* concluded that a trial court could properly consider a spouse's receipt of Social Security benefits in ruling upon a petition for maintenance. *Rogers*, 352 Ill. App. 3d at 899. The reviewing court explained:

> "*Crook* commented on the fact that because Congress reserved the authority to amend or repeal provisions of the Social Security Act, the United States Supreme Court has held that social security beneficiaries have a 'noncontractual interest' in social security benefits and that those benefits are not to be considered as an accrued property right. *** The prohibition against anticipation preserves congressional freedom to amend the Social Security Act and prevents increased harm against a beneficiary whose payments are reduced after he has already been ordered to make a property division based on those payments. [Citation.] An award of maintenance, which is modifiable, does not raise those concerns. The trial court fashions an award of maintenance on the basis of the circumstances disclosed by the evidence at the time of the hearing." *Rogers*, 352 Ill. App. 3d at 899.

In our view, these authorities provide a compelling basis for concluding that a trial court may consider a former spouse's present and anticipated disability benefits in determining the issue of maintenance. Under *Rose*, it is evident that veterans' benefits are not solely for the financial support of the veteran, but for the veteran's family as well. Thus, a veteran's obligation to support his or her family has thus been recognized as an exception to the anti-attachment provisions contained in section 5301(a)(1). *Rose*, 481 U.S. at 632, 95 L. Ed. 2d at 612, 107 S. Ct. at 2037. Under the authorities discussed above, a former spouse seeking maintenance is not treated as a business "creditor," but is instead viewed as an individual seeking the family support intended under the federal provisions authorizing the payment of disability benefits.

Contrary to Paul's assertions, *Crook* does not compel a different conclusion. *Crook* dealt with the question of the treatment of Social Security benefits in the equitable distribution of marital assets and did not address the issue of maintenance and child support. The holding reached by the court in *Crook* was predicated upon its determina-

tion that Congress intended to preempt state law property division schemes as applied to Social Security benefits upon divorce. *Crook*, 211 Ill. 2d at 452-53. As elaborated above, the *Rose* decision clearly reflects the United States Supreme Court's determination that Congress did not intend to preempt state law maintenance and child support schemes when it enacted the anti-attachment provisions contained in section 5301(a)(1). *Rose*, 481 U.S. at 634, 95 L. Ed. 2d at 612-13, 107 S. Ct. at 2038. We agree with the *Rogers* court that, barring express preemption by Congress, a trial court should not ignore the circumstance that one party receives monthly income in the form of a government benefit payment. Therefore, we hold that a trial court may properly consider a party's receipt of veterans' disability benefits in determining a party's obligation to pay maintenance, as well in determining whether the party is entitled to an award of maintenance.

■ We thus find no impropriety in the trial court's consideration of Paul's veterans' disability benefits in ruling upon his request for maintenance. In denying Paul's request, the trial court simply noted that Paul received sufficient income in the form of disability benefits to sustain himself without the need of maintenance from Karen. Under the authorities discussed above, federal law did not preempt the trial court's consideration of these benefits, nor was such consideration precluded by the anti-attachment provisions of section 5301(a)(1). Moreover, we note that the trial court commented that, even if it were to disregard Paul's receipt of disability benefits, Karen's income and expenses rendered her unable to contribute toward Paul's maintenance. We thus find no error in the trial court's reasoning or ruling on Paul's request for maintenance.

■ Paul next contends that the trial court abused its discretion when it reserved ruling on Karen's request for maintenance and ordered Paul to report annually to Karen on the status of his disability. Paul argues that, in light of the VA's determination that he was disabled, the trial court was "without authority to surmise that [his] disability may not be permanent and that maintenance on the basis of employability would be reserved." Paul argues that the trial court's order that he annually report to Karen on the status of his disability infringes upon the "exclusive realm" of the VA. Paul also argues that the trial court erred in denying his request to take judicial notice of the VA's final written order adjudicating him to be disabled.

The propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). This court has indicated that a "reserved-jurisdiction" ap-

proach to maintenance is appropriate in cases where the responsible party's present ability to pay maintenance is limited. *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 41 (1994). As with other maintenance determinations, a trial court's decision to reserve jurisdiction on the issue of maintenance will not be disturbed absent an abuse of discretion. *Marriott*, 264 Ill. App. 3d at 41. A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court. *Schneider*, 214 Ill. 2d at 173. The burden is on the party seeking reversal to show an abuse of discretion. *Schneider*, 214 Ill. 2d at 173.

Here, the trial court apparently determined that Karen was entitled to maintenance due to her limited earning capacity and financial resources. However, because Paul's entire income came from VA disability benefits, the trial court found that it could not consider this income under *Crook* and determined that Paul lacked any income to pay maintenance. Based upon Dr. Zadecki's testimony, the trial court found that there was a possibility that Paul's disability would subside sufficiently to allow him to return to employment. The trial court therefore reserved the issue of maintenance and ordered Paul to annually provide Karen an "updated report relative to his continued disability." The trial court ordered that the reservation remain in effect until the deaths or retirement of the parties, or Karen's remarriage or cohabitation with another.

The trial court's decision to reserve jurisdiction on the issue of Karen's request for maintenance was not an abuse of discretion. The evidence established that Karen's annual income of approximately $22,000 was insufficient to support the same standard of living she enjoyed during the marriage. Under such circumstances, it was reasonable for the trial court to conclude that Karen would be entitled to an award of maintenance in the event that Paul's financial resources allowed. As noted, the trial court found that Paul's present ability to pay maintenance was limited due to his disabled status and his receipt of disability benefits. In light of our discussion above, the trial court properly could have considered Paul's disability income in determining his present ability to pay maintenance. However, Karen has not filed a cross-appeal, and thus we will not disturb the trial court's finding that, as of the date of trial, Paul was unable to pay maintenance. Nonetheless, given Karen's need, we hold that it was appropriate for the trial court to reserve the issue of maintenance.

Paul argues that it was inappropriate for the trial court to reserve ruling on the issue of maintenance in light of the VA's written adjudication that he is permanently disabled. Paul argues that the

trial court should have taken judicial notice of this adjudication and abided by it. Initially, we agree with Paul that the trial court erred in denying his request to take judicial notice of the VA's written adjudication. Public documents that are included in the records of other courts and administrative tribunals may be the subject of judicial notice. *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 520 (1993). Such documents "fall within the category of readily verifiable facts which are capable of 'instant and unquestionable demonstration.' " *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159 (1976), quoting 9 J. Wigmore, Evidence § 330, at 766 (3d ed. 1940). The written decision by the VA in Paul's disability case was a final order entered in an administrative tribunal and should have been recognized by the trial court. As Paul notes, section 511(a) of Title 38 of the United States Code provides:

> "The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. *** [T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise." 38 U.S.C. § 511(a) (2000).

After reviewing the entirety of the evidence appearing in the record, however, we conclude that any error by the trial court in refusing to take judicial notice of the VA's adjudication was harmless. See *Wilder*, 122 Ill. App. 3d at 344-45. We reject Paul's assertion that the adjudication required the trial court to conclude that Paul would be forever unable to work. The VA's written adjudication was a ruling upon Paul's request for the payment of benefits under a program administered by that executive department. Thus, the adjudication was a final and conclusive determination of Paul's right to receive VA disability benefits. This, however, was not the question presented to the trial court for determination. See *Rose*, 107 U.S. at 629, 95 L. Ed. 2d at 610, 107 S. Ct. at 2036 (holding that section 511(a) of Title 38 did not preclude a state trial court from requiring the payment of child support from VA disability benefits because the state court was "not reviewing the Administrator's decision finding the veteran eligible for specific disability benefits"). Instead, the trial court was required to determine whether Paul had the financial resources to pay maintenance to Karen. While the trial court certainly should have considered the materials contained in Paul's VA file, including the

VA's written adjudication, the trial court was not bound to accept the VA's findings as its own.

We conclude that, even had the trial court considered the VA's findings, it still could have reasonably determined that Paul might be able to return to work in the future. Although the VA's written adjudication characterized Paul's disability as "permanent," it did not specifically preclude the possibility that Paul might be able to return to work at some point in the future. Instead, the report rated Paul as 70% disabled and noted that Paul's physician had reported that Paul's symptoms "make employability difficult to obtain and maintain." The report indicated that Paul was nonetheless competent and found that a 100% disability rating was not warranted. At trial, Paul's treating physician, Dr. Zadecki, testified that Paul was presently unable to work as a result of his post-traumatic stress disorder. However, when questioned about the prognosis for Paul's future, Dr. Zadecki testified that he was not "absolutely pessimistic" and acknowledged the possibility that, with medication, Paul might be able to function sufficiently to be self-employed. Presented with such testimony, it was reasonable for the trial court not to foreclose the possibility that Paul might someday be able to return to work.

While we conclude that no abuse of discretion occurred in the trial court's decision to reserve ruling upon the issue of maintenance, we do believe that the manner in which the trial court reserved the matter was impermissibly open-ended and vague. When utilizing a "reserved-jurisdiction" approach to maintenance, this court has cautioned against reserving jurisdiction for excessively long or short periods of time. See *Marriott*, 264 Ill. App. 3d at 41. Previously, we disapproved of a reservation of maintenance for five years, finding that such a lengthy period tended to protract the litigation and did not encourage the dependent spouse to move toward self-sufficiency. See *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 397 (1990). Conversely, we have indicated that too brief a period of reserved jurisdiction would encourage the supporting spouse to delay efforts to become gainfully employed or otherwise improve his or her financial condition. *Marriott*, 264 Ill. App. 3d at 41.

Here, the trial court placed no specific time period upon its reserved jurisdiction. Instead, the trial court ordered Paul to make annual reports to Karen about the status of his disability. This process was to continue until the parties' deaths or retirement, or upon Karen's remarriage or cohabitation. We believe that such a process is excessively protracted and vague and will almost certainly result in contention between the parties and future protracted litigation. We

also believe that such a reservation will result in the difficulties previously noted by this court in *Scafuri* and *Marriott*. We thus vacate the trial court's order reserving jurisdiction over the issue of maintenance and remand the case with instructions that the trial court set a specific date to hold a hearing to rule upon the issue of Karen's request for maintenance. See *Marriott*, 264 Ill. App. 3d at 41. In setting a hearing date, the trial court shall select a reasonable time period based upon the principles above. At the time the trial court conducts such a hearing, it must also determine the parties' incomes in conformity with the governing law detailed above.

For the foregoing reasons, we hold as follows:

(1) we modify that portion of the trial court's judgment dividing the parties' property to reflect that Karen is awarded $4,141.30 of Paul's SEP retirement account and that Paul is awarded the remaining $88,818.70 of the account;

(2) we affirm the remainder of the trial court's judgment dividing the parties' property;

(3) we affirm that portion of the trial court's judgment denying Paul's request for maintenance; and

(4) we vacate that portion of the trial court's judgment reserving jurisdiction over Karen's request for maintenance and remand the case for further proceedings consistent with this opinion.

Affirmed in part, modified in part, and vacated in part; cause remanded with instructions.

O'MALLEY, P.J., and GROMETER, J., concur.