# Illinois Official Reports

## Appellate Court

---

### *Steven W. v. Meeli W.*, 2021 IL App (2d) 200652

---

| | |
|---|---|
| Appellate Court Caption | STEVEN W., Petitioner-Appellee, v. MEELI W., Respondent-Appellant. |
| District & No. | Second District<br>No. 2-20-0652 |
| Filed<br>Rehearing denied | October 27, 2021<br>November 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, Nos. 20-F-30, 20-OP-99; the Hon. Joseph R. Voiland, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Krista Carls, of Krista Carls, P.C., of Hinckley, for appellant.<br><br>Anthony Sammarco, of Stogsdill Law Firm, P.C., of Wheaton, for appellee. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Schostok concurred in the judgment, with opinion. |

**OPINION**

¶ 1        On October 8, 2020, the trial court entered a plenary order of protection compelling respondent, Meeli W., to return the parties' minor children to the custody of petitioner, Steven W., and an order finding Meeli to be in indirect civil contempt, which resulted in the issuance of a writ of body attachment against her. Meeli appeals, arguing that (1) an Estonian court's denial of Steven's Hague application mandated the dismissal of Steven's petition for a plenary order of protection, (2) Steven improperly used the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2020)) to obtain possession of the children, (3) Steven failed to show harassment under the Act, (4) Steven failed to show abuse under the Act, (5) the trial court improperly refused to let Meeli testify remotely, (6) the trial court erred in refusing to acknowledge that Steven purportedly signed a "residency document" consenting to the children's residence in Estonia, and (7) the trial court improperly relied on falsified evidence in entering the plenary order. Because we find that Steven failed to show harassment under the Act, we reverse the trial court's issuance of the plenary order of protection and vacate the trial court's contempt order and writ of body attachment against Meeli.

¶ 2                                    I. BACKGROUND

¶ 3        We summarize the relevant facts from the record on appeal. On November 24, 2012, Steven and Meeli were married in Tartu, Estonia. The parties produced two children while married: J.W. and S.W., who were born in November 2012 and April 2016, respectively. J.W. was born in Estonia, and S.W. was born in Downers Grove. The family resided in Clarendon Hills between July 2015 and January 2018 and then moved to Plano, where they lived from January 2018 to January 2020. While the family lived in Plano, J.W. was enrolled in an elementary school there.

¶ 4        Between July 2015 and January 2020, the family traveled to and from Estonia "on several occasions," after purchasing round-trip airline tickets for each visit. On January 8, 2020, the family left Illinois for another trip to Estonia. Steven testified that the family planned to return to Illinois on January 24, 2020, as reflected by their round-trip tickets. On January 24, 2020, while in Estonia, Meeli and Steven purportedly disagreed whether the family—specifically the children—were to remain in Estonia indefinitely. Eventually, Steven returned to Illinois, while the children remained in Estonia with Meeli. On March 31, 2020, Steven filed his verified petition for an emergency order of protection (No. 20-OP-99 (order of protection case)) to obtain a court order prohibiting Meeli from continuing to withhold the children from Steven. That same day, Steven also filed his emergency petition to allocate parental responsibilities or, alternatively, for injunctive relief (20-F-30 (family case)).

¶ 5                                A. Steven's Allegations

¶ 6        An affidavit was attached to Steven's petitions concerning the January 2020 trip. Steven averred that, while in Estonia, the parties stayed with Meeli's parents, Tarmo S. and Anne S. (collectively, the grandparents). According to Steven, early in the morning of January 24, 2020, as he was packing the children's belongings, Meeli told him that "she could not make the [return] flight" because she had an earache. Steven suggested that he return to the United States with the children and Meeli could join them after she had seen a doctor. Meeli refused. Both Meeli and the grandparents "physically prevented" Steven from packing the children's bags

and physically withheld the children's passports from Steven, prompting Steven to call the Estonian police. However, the police informed Steven that they could not compel anyone to make a visit to the airport.

¶ 7 After determining that it would be impossible to make their flight, Steven suggested that he, Meeli, and the children find a hotel, prompting an argument with the grandparents. Meeli and the grandparents then contacted the police and reported that Steven had insulted Anne. The police asked Steven to leave the grandparents' apartment so that things could "settle down." Afterwards, Meeli and Steven both walked to the United States Embassy. On the way, Steven noticed that Meeli "showed no signs of being too sick to fly or being affected by any earache whatsoever." At the embassy, Steven told officials that "[Meeli] and her family were attempting to take the children from [him] and otherwise detain them in Estonia."

¶ 8 The next day, while the parties were visiting Meeli's grandmother at a nursing home,[1] Steven asked Meeli about the location of the children's passports. Meeli refused to tell him where they were. Steven told Meeli that if she "was not trying to take the children from [him], there was no legitimate reason for her to withhold the children's passports from [him]." As Meeli and Steven continued to argue, Steven tripped over a door jamb and a kitchen chair. Meeli accused Steven of attempting to shove the kitchen furniture into her, and she again called the Estonian police. Steven was held by the police overnight. Tarmo picked Steven up from the police station, leaving him and his belongings at a hotel. He forbade Steven from returning to the grandparents' apartment.

¶ 9 Meeli and the grandparents continued to impede Steven's contact with the children. Steven was allowed to say goodnight to his children only via webcam, and either Meeli or the grandparents would terminate the connection if Steven "said something to the children which would displease" Meeli or the grandparents.

¶ 10 Steven contacted an Estonian attorney dealing with custody cases. Steven's contact with the children remained limited. He was able to physically visit the children only approximately two times per week for one or two hours, all while in Tarmo's presence. During a later visit, after Steven's Estonian counsel provided Meeli with "a deadline to respond to [counsel's] demands for a voluntary return of the children to the United States of America," Anne "panicked" and physically removed the children from Steven, before shoving Steven "in an effort to push [him] down [some] stairs." Steven called the Estonian police, who asked him to file a report. Tarmo similarly removed the children from Steven during a visit at a local McDonald's restaurant.

¶ 11 Steven and his counsel continued seeking to reach an agreement with Meeli concerning the voluntary return of the children, but Meeli's behavior "indicated that she had absolutely no intention to permit the children to return to the United States." On March 9, 2020, Steven received Meeli's "final response," indicating that she would not permit the children to return to the United States. Steven returned to the United States, where he initiated this action.

¶ 12 B. Further Proceedings

¶ 13 Steven appeared before the Honorable Joseph R. Voiland at the hearing on Steven's petition for an emergency order of protection. The court asked Steven's counsel, "And,

---

[1]During the July 20, 2020, hearing on the issuance of a plenary order of protection, Steven testified instead that they attempted to visit Meeli's grandmother but that "[they] did not make it."

[Counsel], this is one of those law school questions, isn't this covered by the Hague Convention?" Steven's counsel responded, "[T]he Hague Convention would permit Steven to retain counsel in Estonia, where the children are currently located[,] in an effort to determine that Illinois is the most appropriate forum, but the Hague Convention would not make any substantive rulings. It only addresses where." After finding that "one of the remedies that the emergency order of protection does address is the improper concealment of minor children," the court found a basis to issue an emergency order of protection "subject to the court retaining jurisdiction over [Meeli]." Consequently, the court granted Steven's petition for an emergency order of protection, which directed Meeli to return to the court's jurisdiction with the children by April 15, 2020, when it would be determined "whether or not [the] order of protection should be extended on a plenary basis."

¶ 14 On April 15, 2020, Meeli did not appear with the children, leading the court to extend the emergency order of protection an additional 14 days. On April 29, 2020, counsel for both parties appeared before a different judge, the Honorable John F. McAdams. Meeli's counsel presented her motion to stay the proceedings as well as her motion to reconsider the issuance of the emergency order of protection, arguing that "[Steven] signed a document in January [2020] in which he intended for the children and [Meeli] to live in Estonia." The court denied her motions and extended the order of protection to June 4, 2020.

¶ 15 On June 4, 2020, the parties appeared for a status hearing on Steven's pending petitions, once again before the Honorable Joseph R. Voiland. The court extended the order of protection to July 20, 2020, when a hearing on the issuance of a plenary order of protection was scheduled to take place. Additionally, the court entered a written order consolidating the order of protection case with the family case.

¶ 16 On June 17, 2020, Meeli filed a motion seeking permission to appear via video or other electronic means at the hearing for the order of protection proceedings. On June 23, 2020, Steven filed his petition for adjudication of civil contempt, seeking "an [o]rder of [r]ule issue against [Meeli] to show cause" why "she should not be held in contempt of court." On June 29, 2020, with both parties' counsel present, the court held hearings on both Meeli's motion and Steven's petition. The court denied Meeli's motion. The court reasoned that granting the motion would be counterintuitive, as it would "reward [Meeli] for her refusal to comply with the pending order [of protection]." The court also expressed its concerns that Meeli would not comply with any future court orders unless she was physically present during the proceedings. Concerning Steven's petition, the court issued its rule to show cause and allowed Meeli until July 20, 2020, to respond thereto.

¶ 17 On July 20, 2020, Steven and counsel for both parties appeared at the hearing on the issuance of a plenary order of protection.[2] Again, Meeli did not personally appear before the court. Steven was called as a witness. During his direct examination, he essentially repeated the allegations he made in the affidavit accompanying his petition for an emergency order of protection.

¶ 18 On cross-examination, Steven admitted that he, Meeli, and J.W. "permanently" moved to the United States in July 2015 after having lived in Estonia. Steven also acknowledged booking round-trip tickets for that trip, despite the family's plans to remain in the United States

---

[2]This hearing began on August 20, 2020, and was eventually continued to September 9, 2020.

indefinitely. Steven suggested that they booked the return tickets because Meeli's green card application was still pending at the time.

¶ 19    Meeli's counsel showed Steven a document—which seems to have been written in Estonian—and asked him whether his signature appeared on the document. Steven responded, "There is a signature that appears that it could be my signature, yes." Counsel then asked, "Isn't it true that on February 23, 2017, you signed this *** document in Estonia?" Steven could not recall. When asked whether he understood "that [the] document established residency *** for [his] children in Estonia," Steven replied, "No." Instead, Steven indicated that the document was intended "to record where [the children] will be while they are in Estonia." He continued, "This is for the police, so if the police find the children lost in the mall, they could return the [children] to an address."

¶ 20    Meeli's counsel showed Steven a second document—which she later referred to as the January 2020 residency document—and asked whether the signature on the document was his. Steven admitted that the signature "could be [his]." Steven first claimed that he had not seen the document "[that] year," before acknowledging that he had previously seen the document when Meeli sent it to his Estonian attorney in "[e]arly March [2020]." Steven did not recall signing the document. Steven disagreed that the document "provide[d] an address for a new place of residence," although he acknowledged that the document contained his children's names and the grandparents' address. Steven affirmed that he was denying that he had "not done anything to establish residency of [his] children in Estonia." While he previously testified that he did not remember signing the document, Steven eventually attempted to explain why he did in fact sign it:

> "[G]enerally, if you were staying in Estonia for a period of time, you must report to the Estonian police where your staying place is, all students, anyone that's visiting, other than a tourist. All Estonian citizens are required to have their address filed with the police. My understanding is if the police for some reason *** have the children, that they then know where to take the children[,] *** like if the children are lost in the mall, then they'd bring the children to [the listed] address."

¶ 21    Meeli's counsel asked Steven whether between January 8, 2020, and January 24, 2020, when the family was still in Estonia, J.W. was "required to go to school." Steven indicated that he and Meeli had notified J.W.'s Plano school that they were on vacation "and that as soon as [they] returned, he would return to school." Steven specified that sometime after January 24, 2020, when the family was purportedly scheduled to return to the United States, he learned that Meeli unilaterally told the school that the children would not be returning. On redirect examination, Steven's counsel asked him questions concerning J.W.'s school. Steven testified that J.W. had left several items at the school after being removed by Meeli, including a coat, clothing, crayons, pencils, and a book bag. Steven rested his case after testifying.[3] At this point, before Meeli presented her case, the court continued the hearing on the issuance of a plenary order to August 20, 2020. The court also continued the hearing on the rule to show cause until the conclusion of the hearing on the issuance of a plenary order, presumably to first determine whether Meeli wrongfully held the children in Estonia.

---

[3]The trial court initially planned to hear the parties' witnesses out of order and agreed that Steven would call an additional witness after Tarmo later testified. However, Steven eventually changed his mind and rested his case retroactively.

- 5 -

¶ 22    On August 20, 2020, the hearing on the issuance of a plenary order resumed, and Tarmo testified remotely on behalf of Meeli, with the aid of an interpreter. On direct examination, he testified that beginning on January 9, 2020, he resided in Estonia with Anne, Meeli, Steven, and the children. When Tarmo picked up the family from the airport, he understood "that they were to come here to first register the children[,] and then [Steven] would need to complete his business and then he would return *** also." In anticipation of receiving the family in their home, the grandparents purchased extra beds, bookcases, armoires, and other furniture, and they made further preparations for the children.

¶ 23    On January 13, 2020, after discussing "the [January 2020 residency document]" with Meeli, Tarmo presented the document to Meeli and Steven. Tarmo saw Steven sign the document, and Tarmo signed it as well. Meeli's counsel showed Tarmo her exhibit 10, which Tarmo identified as the signed form. Tarmo stated that "[t]he document was about Meeli and the children having the right to live [in Estonia]." After the parties signed the form, Tarmo and Meeli took it "to the *** city government [(in Estonia)]." Tarmo also indicated that he had the original form in his possession and that Meeli's exhibit 10 was a true and accurate copy of the original signed form. Tarmo remembered signing a similar form at some point in 2017, as he had purportedly allowed Steven, Meeli, and the children to live with him at that time as well. Meeli's counsel sought to admit both the February 2017 and the January 2020 residency documents "for the purpose of establishing that [Tarmo] observed [Steven] sign [the] document," but the trial court denied her request, finding that counsel had failed to comply with the rules of evidence concerning the authentication of foreign documents.

¶ 24    Tarmo acknowledged that Meeli had placed the children's passports in a safe that was kept in their apartment. On January 24, 2020, Steven began looking through the grandparents' belongings—presumably attempting to find the passports. Steven appeared to be angry and sought to provoke the grandparents into hitting him. This prompted Anne to call the police.

¶ 25    Tarmo further testified that he and Meeli did not prevent Steven from seeing the children. Tarmo did accompany Meeli whenever she met Steven for his visits with the children.

¶ 26    After Tarmo testified, the hearing on the issuance of a plenary order of protection was continued to September 9, 2020. The emergency order of protection was extended through that date as well. On September 1, 2020, Steven filed a motion requesting a hearing on the pending April 29, 2020, rule to show cause and a motion for a default judgment. That same date, Meeli filed her motion to dismiss Steven's petition for a plenary order of protection and petition for rule to show cause, arguing that the Estonian court had recently denied Steven's Hague application, "finding that the *** children have not been improperly removed from the United States nor improperly retained in Estonia." Consequently, Meeli argued, the pending matters before the court must be dismissed because "[t]he issue of whether or not the children have been improperly removed from the United States and retained in Estonia has been decided pursuant to the Hague Convention, a U.S. Treaty, of which the United States and Estonia are signatories."

¶ 27    On September 9, 2020, counsel for both parties appeared for the continued hearing on the issuance of a plenary order of protection. The court addressed the parties' pending motions. Meeli's counsel brought a translated and properly authenticated copy of the Estonian court's order and tendered copies of it to the court and opposing counsel. The court continued the hearing in order to have an opportunity to review the Estonian order and set a briefing schedule on Meeli's motion to dismiss.

¶ 28        As Meeli represented, the Estonian court order—which is contained in the record and dated July 17, 2020—did deny Steven's Hague application. The Estonian court further concluded that Steven brought forth his Hague application not because Meeli had removed the children but because of the "termination of the cohabitation of [Meeli and Steven]." Regardless, because the children resided in Estonia since January 2020, the court found that no unlawful removal or retention had taken place and dismissed Steven's petition.

¶ 29        On September 25, 2020, the trial court held a hearing on Meeli's motion to dismiss. At the conclusion of that hearing, the trial court found that the Estonian decision did not divest the trial court of jurisdiction, that *res judicata* did not apply to the matter, and that it was not preempted or estopped by the Estonian court's decision in any manner, "because the issues decided by the Estonian court under the provisions of the Hague Convention are clearly different and do not pertain to the issues before the court as it relates to the [Act]." The court then denied Meeli's motion to dismiss.

¶ 30        On October 8, 2020, the trial court commenced its hearing on the issuance of a plenary order of protection. Meeli called Steven to once again testify. Meeli asked Steven whether Meeli told him prior to the January 2020 trip that she was planning on staying in Estonia with the children. Steven responded "No" and explained that Meeli would not "talk about anything to do with the children." Meeli asked several questions about Steven's various visits with the children during his last stay in Estonia. These visits included three meetings at a local café, a meeting at a playground, three visits at a library, a visit at a "playroom," a visit at the grandparents' house, and a visit at McDonald's. When asked whether Steven could "think of any time [Meeli] said, ['N]o, you can't see the children[,'] " Steven replied, "Yes. I called a dozen times every single day asking to see the children." However, Steven agreed that he had been able to see the children via video chat.

¶ 31        After Steven testified, the court orally issued its ruling. The court found that, despite the fact that the parties went to Estonia together, "it was the intention of both [Steven] and [Meeli] to return to Illinois *** and that [Meeli] elected not to go." According to the court, because Meeli therefore "refused and continues to refuse to return the *** children to the State of Illinois," Meeli "improperly removed" the children. Therefore, the court determined that Steven was an abused person as defined by the Act and that Meeli "has harassed [Steven] as defined in [section] 103(7)(v) [of the Act]." The court agreed with Meeli that "there has not been an improper concealment of the child[ren], but *** there has been an improper removal of the child[ren]."

¶ 32        Having found that Meeli harassed Steven "by improperly removing the minor children from the state, or the jurisdiction of the State of Illinois[,] and refusing to return the minor children," the court noted that Meeli had failed to rebut by a preponderance of the evidence "the presumption that the improper removal of the children from this jurisdiction has caused and is causing emotional distress to [Steven]." After making these findings, the court entered a plenary order of protection consistent with the terms of Steven's previous emergency order. Based on its findings of abuse and harassment under the Act, the court also found Meeli to be in indirect civil contempt of court for willful failure to return the children to Illinois pursuant to its previous emergency orders. Furthermore, "in light of the fact that [Meeli was] not physically present in [the] courtroom," the court issued an order of attachment to "remain in effect until the purge is satisfied."

¶ 33                                                    II. ANALYSIS

¶ 34         We agree with Meeli's arguments that Steven failed to show either harassment or abuse under the Act. While Meeli makes several additional arguments concerning other perceived errors that the trial court allegedly made, in light of our resolution of the foregoing, we need not address those contentions.

¶ 35                                              A. Motion to Strike

¶ 36         Initially, we consider Steven's motion to strike Meeli's reply brief, which we ordered to be taken with this case. Steven argues that, in Meeli's reply brief, Meeli failed to "provide appropriate references to the [r]ecord on [a]ppeal or *** controlling precedent" in support of her claims that Steven consented to the children's permanent relocation to Estonia. Steven similarly argues that Meeli's reply brief did not contain adequate citations of the record to support her argument that the Estonian court order precluded the trial court from maintaining this action. Steven additionally suggests that Meeli's reply brief improperly referenced unadmitted evidence, such as testimony detailing Meeli's version of events and the January 2020 residency document. Steven also takes issue with Meeli's arguments that Steven allegedly falsified testimony concerning the residency document. According to Steven, these arguments were improper because they were accompanied by citations to Tarmo's testimony within the record, which could not possibly establish the allegedly false nature of Steven's testimony. For these reasons, Steven requests that we strike Meeli's reply brief in its entirety.

¶ 37         The Illinois Supreme Court Rules require arguments in an appellant's brief, including the reply brief, to be accompanied by "citation[s] of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). The Illinois Supreme Court Rules are not "mere suggestions" but instead "have the force of law and are to be construed in the same manner as statutes." *In re Denzel W.*, 237 Ill. 2d 285, 294 (2010). "A party's brief that fails to substantially conform to the pertinent supreme court rules may justifiably be stricken." *Gruby v. Department of Public Health*, 2015 IL App (2d) 140790, ¶ 12. However, striking a party's brief is a harsh sanction and should be done only when a party's noncompliance with the rules hinders our review. *Id.*

¶ 38         We agree with Steven that Meeli's reply brief was problematic. As Steven points out, many—but not all—of the factual statements that Meeli sets forth in her reply are unaccompanied by any citations of the record. Several of Meeli's citations—specifically those relating to the Estonian court order—list imprecise page ranges within the record instead of references to single pages. Meeli also details testimony that was not properly admitted before the trial court, such as her "version of events" surrounding the January 2020 Estonia trip. Furthermore, although there is testimony in the record indicating the existence of the January 2020 residency document, as well as Tarmo's understanding that "[t]he document was about Meeli and the children having the right to live [in Estonia]," the document itself was not admitted into evidence, meaning that Meeli's claim that "[Steven] signed a document consenting to residency of the children in Estonia" mischaracterizes the evidence adduced before the trial court. Finally, Steven correctly points out that Tarmo's testimony could not affirmatively establish whether Steven gave falsified testimony before the trial court

concerning the January 2020 residency document,[4] although other portions of the record—which Meeli confusingly failed to cite—do establish that he gave conflicting testimony concerning the supposed document.

¶ 39 While Meeli's noncompliance is not to be countenanced, it did not hinder our review, which is the primary factor in deciding whether to impose the harsh penalty of striking her brief. *Id.* As mentioned above, Steven failed to prove either harassment or abuse under the Act as a matter of law. While Meeli discusses as much in her opening brief, she does not make such an argument in her reply brief. Instead, her reply brief predominately responds to Steven's arguments concerning the preclusive effect of the Estonian court ruling, Steven's purported consent, and the trial court's jurisdiction under the Act. Therefore, because Meeli's reply brief did not add to our analysis, her repeated errors cannot be said to have hindered our review. While we consequently decline to strike her reply brief, we do ignore any noncompliant portions therein. Additionally, in light of Meeli's repeated infractions of Rule 341, we do offer her a stern warning to comply with our supreme court's rules in the future.

¶ 40 Having disposed of Steven's motion to dismiss, we now turn to the substance of this appeal.

¶ 41 B. Harassment and Abuse under the Act

¶ 42 Because the trial court improperly found that Meeli's conduct constituted harassment and abuse under the Act, it erred when it issued a plenary order of protection. "In any proceeding to obtain an order of protection, the central inquiry is whether the petitioner has been abused." *Best v. Best*, 223 Ill. 2d 342, 348 (2006). Therefore, to obtain relief under the Act, a petitioner must prove abuse by a preponderance of the evidence. *Id.* A circuit court's finding of abuse will not be disturbed on appeal unless such a finding was against the manifest weight of the evidence. *Id.* at 349.

¶ 43 Pursuant to the Act, " 'Abuse' means physical abuse, *harassment*, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis." (Emphasis added.) 750 ILCS 60/103(1) (West 2020). The Act further defines "harassment" as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). Under the Act, the following conduct creates a rebuttable presumption of emotional distress:

> "[I]mproperly concealing a minor child from petitioner, repeatedly threatening to improperly remove a minor child of petitioner's from the jurisdiction or from the physical care of petitioner, repeatedly threatening to conceal a minor child from petitioner, or making a single such threat following an actual or attempted improper removal or concealment, unless respondent was fleeing an incident or pattern of domestic violence." *Id.* § 103(7)(v).

¶ 44 In her opening brief, Meeli argues that the terms of section 103(7)(v) do not apply to this case. Instead, Meeli points out that the family simply traveled to Estonia, that Meeli and Steven had a disagreement as to whether they planned to stay in Estonia, and that Steven eventually returned to the United States, alone. While Meeli acknowledges that Steven's petition for an

---

[4]Still, we note that, because it conflicts with Steven's testimony, Tarmo's cited testimony does give rise to an inference that Steven may have lied about signing the document.

emergency order of protection alleged that she sequestered the children and refused to return them to the United States, she argues that these allegations "do not rise to the level of harassment." In response, Steven argues that "[Meeli] does not elaborate on how the court's finding was incorrect, against the manifest weight of the evidence, or how the court may have committed error in its application of the [Act]." Steven further asserts that his "evidence absolutely fell within the statutory definition of harassment as a matter of law." We disagree.

¶ 45   In his closing argument, Steven did not argue that Meeli's conduct satisfied the aforementioned elements of harassment under section 103(7), requiring "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances[,] would cause a reasonable person emotional distress[,] and does cause emotional distress to the petitioner." *Id.* § 103(7). Instead, Steven argued that Meeli's removal of the children constituted harassment *per se* under section 103(7)(v) of the Act,[5] contending that "[t]he [Act] says that if you take a child away from another parent, that's a form of harassment which is proscribed by [the Act]." The trial court agreed with Steven. In issuing a plenary order of protection, the trial court repeatedly emphasized that Meeli "improperly removed" the children from the State of Illinois and that the removal in and of itself constituted harassment under the Act:

> "[Meeli] has improperly removed the minor child [*sic*] from the state of Illinois and [that determination] is based upon the testimony *** that, although the parties did go to Estonia, *** it was the intention of both [Steven] and [Meeli] to return to Illinois[,] and that they had plane tickets and were prepared to go and that [Meeli] elected not to go. ***
>
> [T]he court further finds that [Meeli] has refused and continues to refuse to return the [children] to the *** State of Illinois.
> ***
> Pursuant to the [Act], [Steven] is an abused person as defined by Section 103(1) *** and [Meeli] has harassed [Steven] as defined in 103(7)(v).
> * * *
> As a result, the court finds that [Meeli] has harassed [Steven] by improperly removing the minor children from the state, or the jurisdiction of the State of Illinois and refusing to return the minor children to this jurisdiction."

The trial court also found that, because Meeli's conduct fell under section 103(7)(v), there was a rebuttable presumption that Steven suffered emotional distress and that it was Meeli's burden to rebut that presumption:

> "[Meeli] has failed to rebut by a preponderance of the evidence the presumption that the improper removal of the children from this jurisdiction has caused and is causing emotional distress to [Steven], and again[,] pursuant to [the Act,] it is the burden of [Meeli] to rebut the presumption that there is abuse under the terms of the [A]ct."

¶ 46   Here, even if we were to assume that Meeli's alleged conduct did amount to an improper removal from the state, such an improper removal in and of itself does not fall under the

---

[5]Steven also acknowledged as much during oral argument.

language of section 103(7)(v). Therefore, Steven's argument was incorrect, and the trial court erred in asserting that "[Meeli] has harassed [Steven] as defined in [section] 103(7)(v)."

¶ 47 As set forth above, section 103(7)(v) of the Act provides four different types of conduct that are presumed to cause emotional distress. *Id.* § 103(7)(v). The first type of described conduct concerns the "improper[ ] conceal[ment]" of a minor child from a petitioner. *Id.* The second type of described conduct concerns repeated threats to improperly remove a petitioner's child. *Id.* The third type of conduct involves repeated threats to conceal a minor child from a petitioner. *Id.* Finally, the fourth type of conduct involves making "a single such threat following an actual or attempted improper removal or concealment, unless respondent was fleeing an incident or pattern of domestic violence." *Id.*

¶ 48 Meeli's conduct as alleged does not fall within any of the four types of conduct enumerated in section 103(7)(v). Although Steven did testify that Meeli and the grandparents effectively concealed the children from him by limiting his access to them, Tarmo testified that Steven had unbridled access to both children. After hearing both Steven's and Tarmo's testimony, the trial court agreed with Meeli that "there has not been an improper concealment of the child[ren]." "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51. Therefore, we will not disturb the trial court's finding that no concealment took place. As such, the first type of conduct detailed in section 103(7)(v)—which involves the concealment of a minor child—clearly does not apply.

¶ 49 Furthermore, Steven makes no argument that Meeli ever *threatened* to improperly conceal or remove the children. In fact, the record rebuts such a conclusion. Steven testified that Meeli refused to "talk about anything to do with the children." Steven also repeatedly testified that he was surprised by Meeli's supposed unilateral decision to withhold the children in Estonia. Clearly, if Steven was surprised by Meeli's actions, it seems unlikely that she threatened to remove or conceal the children prior to the family's January 2020 trip to Estonia. Because Steven did not allege that Meeli threatened to remove or conceal the children, the second, third, and fourth types of conduct described under section 103(7)(v)—which all require threats to be made against a petitioner—do not apply. Despite having previously argued that Meeli's conduct constituted harassment under section 103(7)(v), Steven conceded at oral argument that none of the four types of conduct described in section 103(7)(v) included Meeli's actions.[6] Steven did not contend an alternative basis of harassment either before the trial court or on appeal by arguing that Meeli's conduct satisfied the general elements of harassment set forth in section 103(7) of the Act. Therefore, he forfeited such an argument. *Peal v. Lee*, 403 Ill. App. 3d 197, 211 (2010).

¶ 50 Because Meeli's conduct therefore did not fall under section 103(7)(v) of the Act, the trial court erred in finding that Meeli's conduct created a rebuttable presumption of emotional

---

[6]Even if Meeli's conduct hypothetically did fall under section 103(7)(v), we are unconvinced that this would definitively mean that she harassed Steven. The Act specifies that the different types of conduct listed in section 103(7)(v) "shall be presumed to cause emotional distress." 750 ILCS 60/103(7)(v) (West 2020). However, emotional distress is only one element of harassment under section 103(7). *Id.* § 103(7). Therefore, even if Meeli's conduct fell under section 103(7)(v), Steven would still presumably need to show the remaining elements to establish harassment under the Act.

distress[7] and by consequently holding that "[Meeli] has harassed [Steven] as defined in 103(7)(v)." Thus, because the trial court's finding of harassment was based on an improper application of the Act and not by the evidence presented, its finding of harassment was against the manifest weight of the evidence. See *Maurissa J.B. v. Ingrida K.*, 2019 IL App (2d) 190107, ¶ 45 (holding that the trial court's finding of harassment was against the manifest weight of the evidence when it was not based on the evidence presented). Because the trial court's finding of abuse was based on the finding of harassment, it too was against the manifest weight of the evidence. 750 ILCS 60/103(1) (West 2020) (providing that "abuse" includes "harassment" as defined by the Act).

¶ 51 Regardless, Steven suggests that Meeli's arguments to this point should be stricken pursuant to Rule 341. Specifically, Steven contends that "Meeli's [b]rief fails to comply with Illinois Supreme Court Rule 341 and does not provide an accurate or appropriate reference to the [r]ecord on [a]ppeal so that a counter argument may be provided." While Steven does not identify which of Meeli's allegations he is referring to, it is true that some of the factual allegations that premised Meeli's arguments lacked citations to the record. These unsupported allegations include the parties' departure date for the January 2020 trip to Estonia and the allegations that the parties stayed with grandparents while in Estonia, that Meeli and Steven had a disagreement while in Estonia, and that Steven left Estonia in March 2020.

¶ 52 While Meeli's failure to provide citations for each of these factual allegations is another example of her failure to comply with Rule 341, it seems disingenuous to suggest that her failures impeded Steven's ability to respond to her arguments. Most of the unsupported factual assertions Steven identifies were properly supported in Steven's brief, which undercuts the force of his argument considerably. Furthermore, it is obvious that Meeli and Steven had a disagreement while in Estonia; otherwise there would be no controversy between the parties culminating in this action. Therefore, all these unsupported allegations were readily known to Steven and could not have resulted in surprise. Because Meeli's failures to adhere to Rule 341 therefore did not prejudice Steven or hinder our review, we will not strike her arguments.

¶ 53 Citing *In re Marriage of Timke*, 219 Ill. App. 3d 423 (1991), Steven additionally argues that Meeli forfeited any rights to appellate review by her repeated violations of the trial court's emergency orders. We disagree. In *Timke*, the trial court entered an order holding the respondent in contempt for failure to comply with the petitioner's discovery demands and with orders requiring the respondent to appear in court. *Id.* at 425. At that time, the respondent departed for the Cayman Islands, telling the petitioner " '[t]hat no judge would tell him what to do with his money after he had worked for 40 years.' " *Id.* The *Timke* court noted:

> "Our supreme court has clearly and unmistakably held that a party who is adjudged to be in contempt of the trial court for failure to abide by its orders, and who has removed himself beyond its process and concealed himself outside the State of Illinois and seeks to attack the final decree of the court which he is defying, is not entitled to appellate relief." *Id.* at 426.

As such, the *Timke* court decided that the respondent was not entitled to appellate review of his arguments.

---

[7]Accordingly, the trial court also erred in shifting the burden of disproving emotional distress onto Meeli.

¶ 54    *Timke* is easily distinguishable from this matter. There, the respondent fled Illinois in response to the trial court's contempt order. *Id.* at 425. Here, on the other hand, Meeli was outside of the trial court's jurisdiction before the court issued any of its emergency orders or its October 8, 2020, contempt order. In fact, Meeli was outside of the trial court's jurisdiction before this action commenced. Therefore, unlike the respondent in *Timke*, it cannot be said that Meeli fled the state to evade the court's jurisdiction. Additionally, because the trial court's determination of abuse was against the manifest weight of the evidence, there was no basis under the Act for the court to order Meeli to return the children to Illinois.

¶ 55    While Steven's failure to show harassment and abuse under the Act resolves this matter, we are nonetheless compelled to briefly address what we consider to be Steven's improper use of the Act in the underlying proceedings. The purpose behind the Act is to aid victims of domestic violence by preventing further abuse. 750 ILCS 60/102 (West 2020). One misuses the Act by using its provisions for the primary purpose of obtaining custody of a child. *Radke v. Radke*, 349 Ill. App. 3d 264, 269 (2004). Such an issue is better "resolved under the Illinois Marriage and Dissolution of Marriage Act." *Id.*

¶ 56    During oral arguments, Steven was asked what relief he hoped to obtain through the issuance of a plenary order of protection. Eventually, he responded:

> "If I was fortunate to have this matter affirmed on appeal, and if I was fortunate enough to prevail in the pending custody proceedings, I would have a very good chance of counsel in Estonia *** securing an order from their court for custody of the children and enforcement of the Illinois decree. That's why we're here."

When asked whether the pending custody proceedings were a better vehicle for Steven's claims, Steven suggested that he had previously filed a petition under the family case but that no evidence was elicited "on the custody matter" and they "really didn't get to that."

¶ 57    Steven's responses plainly show that the primary motivation behind his petition for a plenary order of protection was to obtain custody of the children. He admitted that obtaining such an order was one step that he needed to take in order to obtain a favorable custody determination in Estonia. He further admitted that he used the Act's provisions to advance his claims because the family case remained stagnant before the trial court. For these reasons, Steven has misused the Act, and such a misapplication should not be rewarded through the issuance of a plenary order of protection.

¶ 58    For all of these reasons, we agree with Meeli that Steven failed to show abuse under the Act. Consequently, we reverse the trial court's issuance of a plenary order of protection. Similarly, because the court's findings of abuse were against the manifest weight of the evidence, the court had no basis to either enter the October 8, 2020, order holding Meeli in contempt for failing to return the children or issue a writ of body attachment against her. Therefore, we vacate those orders as well.

¶ 59                                    III. CONCLUSION
¶ 60    For the reasons stated, we reverse the judgment of the circuit court of Kendall County.

¶ 61    Reversed.