2023 IL App (2d) 220154-U
No. 2-22-0154
Order filed November 13, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| In re MARRIAGE OF GENUEL ALMODOVAR, JR., | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 19-D-975 |
| JANET ALMODOVAR, | ) ) ) | Honorable Charles W. Smith, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in dividing the marital estate equally; the trial court's reservation of maintenance was not an abuse of discretion; where the trial court erroneously stated that the wife had not filed a petition for contribution for attorney fees, it abused its discretion by denying the wife's petition. Trial court is affirmed, in part and vacated, in part, and the cause is remanded.

¶ 2    On March 5, 2021, after a bench trial, the trial court entered judgment dissolving the marriage between petitioner, Genuel Almodovar, Jr. (Mark), and respondent, Janet Almodovar. Janet appeals, arguing that the trial court erred when it (1) failed to allocate her a greater share of the marital estate, (2) failed to award her indefinite maintenance, and (3) denied her petition for

contribution for attorney fees. For the following reasons, we affirm, in part, vacate in part, and remand for further proceedings.

¶ 3                                        I. BACKGROUND

¶ 4      Mark and Janet married in 1981. Two children, each of whom are now emancipated, were born to the couple. In June 2019, Mark petitioned to dissolve the marriage. The matter proceeded to a three-day trial on September 29, 30, and October 16, 2020. Prior to the trial, the parties filed numerous motions mostly related to which party was going to have control of the marital asset, M&J Machinery (M&J). The parties founded M&J in 2005 and each owned 50% of the business. M&J is a manufacturer of precision machine components and parts that has employed as many as 18 people, including the parties' son, Eric. Many of the employees are highly skilled machinists.

¶ 5                                  A. Pre-Trial Proceedings

¶ 6      On June 17, 2019, the day before Mark filed his petition for dissolution of marriage, he filed a verified petition for an order of protection against Janet, wherein he averred that Janet "attacked [him], hit [him] repeatedly, scratched [him], which caused bruises and scratches to [his] face and [his] body [and that Janet] has many guns which she keeps in the house." Mark also stated that he called the police, and that Janet was arrested for domestic battery.

¶ 7       On July 8, 2019, the trial court entered an agreed order that provided, *inter alia*, that Mark shall have exclusive possession of the marital residence in Antioch.

¶ 8      On October 4, 2019, Janet filed an "Emergency Verified Petition for Temporary Injunctive Relief and the appointment of a Receiver" (petition for injunctive relief). Janet alleged that for the last two years, Mark had only occasionally shown up to work and that when he did, he antagonized skilled and vital employees. Six valuable employees quit due to Mark's behavior, which caused M&J to lose business and revenue. Mark was also antagonistic towards Janet who was M&J's

corporate secretary, and Eric, who ran the company in Mark's absence. Mark also had surveillance cameras installed on M&J's premises to remotely monitor everyone at the company. Janet's petition filed an order seeking to restrain Mark from acting as an officer and/or director of M&J, managing or interfering in the management of M&J, retaining any M&J property, and being on M&J property. Janet also sought an order to appoint Eric as the receiver of M&J.

¶ 9       On October 15, 2019, the trial court entered an agreed order that "[t]he status *quo ante* with the respect to the operation of [M&J] shall be maintained until further court order."

¶ 10      On October 28, 2019, Janet filed an emergency petition for adjudication of indirect civil contempt, that recounted the allegations of her petition for injunctive relief and alleged that Mark violated the court's October 15 order when he transferred $100,000 from M&J's checking account into his personal account.

¶ 11      On October 29, 2019, the trial court entered an order that allowed Janet to run M&J and restricted Mark from accessing the building with the exception of once per day and in case of an emergency.

¶ 12      On January 31, 2020, Janet filed a "Supplement to [her]: Emergency Verified Petition for Adjudication of Indirect Civil Contempt," wherein she alleged, further instances of Mark's misconduct regarding M&J including, his threats to Janet and Eric as they attempted to hire new employees, pay Christmas bonuses, and pay vendors with the company credit card. Janet also alleged that Mark stopped paying her salary since December 2019 and "absconded with $250,000 of business funds," which left M&J without adequate working capital; in early December 2019, Janet and Eric terminated Mark's brother, Jeff Almodovar because he routinely showed up to work with a gun.

¶ 13    On March 6, 2020, Janet filed a motion to vacate the agreed order dated July 8, 2019, and asked the court to refer the matter to the Lake County State's attorney for investigation of perjury and for filing a false police report. Janet alleged that during Mark's February 10, 2020, deposition, he repeatedly impeached himself and contradicted the allegations that he made to the Antioch police that caused her to be arrested for battery and to be incarcerated overnight. Then, on June 18, 2019, Mark obtained an emergency order of protection based on the false battery charges. Using the order of protection, Mark manipulated Janet to trade away possession of the marital home to ensure her freedom and continued employment with M&J. Thereafter, Mark moved his "paramour" into the marital home.

¶ 14    On March 10, 2020, the court heard testimony regarding Janet's petition for injunctive relief. Janet's counsel asked Mark if he stated under oath in his domestic violence petition, "my wife has many guns which she keeps in the house." Mark agreed that he made that statement. He also agreed that when he made that statement, there were no guns in the house other than the guns that were in his vault. Mark did not agree that his statement that "his wife has many guns" was false, because "[g]uns are marital property."

¶ 15    On June 24, 2020, Janet filed a second supplement to her emergency petition for a temporary restraining order and appointment of a receiver. Janet alleged *inter alia*, that Mark obtained a Payroll Protection Program (PPP) loan in the amount of $217,775, and had used $36,000 of the PPP loan to pay off the mortgage on the marital residence and $50,000 to pay his attorney's fees. Janet also alleged that Mark withdrew $100,000 from the parties' health savings account, transferred $100,000 from the parties' joint account into his personal account, and withdrew $150,000 from M&J's business account.

¶ 16                                    B. Testimony

¶ 17    The parties stipulated that the testimony adduced from the pretrial hearings would be adopted by the trial court as evidence in the trial. We recite only the testimony and other evidence relevant to our resolution of the issues raised in this appeal.

¶ 18    Janet, 58 years old at the time of trial, completed school through the 10th grade in Puerto Rico. She worked all her life. The parties married in 1981 and had two children, Eric, born in 1984, and Erica, born in 1991. Early in the parties' marriage, Janet worked at Fox Plastics, running operations on machines and as an inspector. Later, she worked as a babysitter for various families, which enabled her to care for the parties' children. While raising the children, Janet also worked as a manager at a White Castle restaurant to provide health insurance for the family, while helping to facilitate the parties' 2006 launch of M&J. In 2012, Janet began to work fulltime for M&J. She worked approximately 50-60 hours a week as a "jack-of-all-trades," with a wide range of responsibilities including delivery assistance, inventory, business meetings with Eric, and ordering supplies. Janet also helped inspect machines and manage employees.

¶ 19    Throughout the marriage, including while Janet worked full-time at M&J, she also maintained and managed the parties' home life. She raised the children, cooked, cleaned the home, and did the family laundry. Janet had no help from anyone else, other than the occasional babysitter.

¶ 20    Mark, 58 years old at the time of trial, testified that he completed one year of college. His first job was at Titan Tool, where he worked for 25 years. During the parties' marriage, Mark worked 12-18 hours a day. Mark described himself as a "master machinist" who has an exceptional knowledge of the machinist trade and industry. At M&J, Mark designed parts for customers, worked with the engineering team, and worked on design software. Beginning in March 2018 Mark effectively withdrew from M&J. He did very little with the company, and only occasionally

showed up to work. Mark spent his time vacationing in his camper in Florida. He testified that his age and medical issues prevented him from finding another job outside of M&J. Mark admitted that he had not tried to find another job. Two years before the trial, a doctor told Mark that he needed a hip and shoulder replacement. But this did not prevent Mark from working out or doing his job at M&J.

¶ 21    In 2019 each party earned approximately $200,000 from M&J.

¶ 22                              C. Posttrial Proceedings

¶ 23    In November 2020 Janet filed an emergency motion seeking to bar Mark from having anything to do with M&J. This motion was filed after Mark showed up at M&J on October 28, 2020, accompanied by two Antioch police officers and attempted to take control of the business. On November 10, 2020, after a hearing, the trial court granted Janet's petition for injunctive relief, and (1) enjoined Mark from, *inter alia*, entering M&J, harassing and/or intimidating Janet and Eric, having contact with M&J's employees, its customers, vendors, bankers, creditors, and/or service providers; and (2) ordered Mark to be removed from any M&J corporate and/or employment position, and to return all M&J property.

¶ 24    On January 15, 2021, the trial court entered an agreed order providing, in part, that petitions for contribution of attorney's fees shall be submitted by January 19, 2021. On January 19, 2021, Janet filed a petition seeking contribution for attorney's fees and costs from Mark. She alleged that her attorneys attempted to preserve the parties' business, M&J, despite Mark's destructive behavior. Janet alleged numerous detrimental actions taken by Mark. She argued that "Mark's attempts to sabotage M&J and subvert Janet and Eric's efforts to operate M&J unnecessarily protracted this litigation and substantially increased the costs of this litigation." Janet argued (1) that most of the fees she incurred "relate to her attempts to preserve the marital estate"; (2) her

financial stability will be undermined without contribution from Mark; and (3) Mark should pay Janet's attorney's fees given the relevant statutory factors and the disparity between the parties' incomes and assets. Janet noted that her counsel had been paid $128,272 and was owed $294,734.

¶ 25    Mark also filed a petition for contribution of attorney's fees and costs. Mark alleged that he owed approximately $200,000 in fees to his current counsel.

¶ 26    On February 19, 2021, the trial court announced its "Findings and Final Order Following Trial."

¶ 27    On March 1, 2021, Mark filed a motion to enter a judgment for dissolution of marriage *nunc pro tunc* to February 19, 2021. The motion noted that the trial court's prior order did not award the parties a judgment of dissolution.

¶ 28    On March 5, 2021, the trial court entered a "Judgment of Dissolution of Marriage" (judgment). The judgment largely incorporated the trial court's February 19, 2021, findings and final order. The judgment awarded each party 50% of M&J. Regarding M&J, the judgment states:

> "[T]he court will afford each party the opportunity to purchase the other's stock by tendering the other $1,250.000 in cash within 7 days of the entry of this order. Should neither party buy the other shares then the court will appoint a Receiver ***. The Receiver is to sell the business *** at the highest possible price. After deducting the Receiver's fees and the costs of the sale each party will be entitled to one half (50%) of the net proceeds."

¶ 29    The trial court divided the parties' remaining assets equally between the parties and expressly rejected their arguments that "they should receive a disproportionate share of the marital assets." These assets included a house in Antioch (valued at $267,000), retirement accounts, cars, boats, and a vacation property (time share) in Mexico. The court "reserved maintenance until it is determined if either party is going to purchase M&J." Regarding attorney fees, the court

recognized that Mark sought contribution from Janet, but it mistakenly stated that "Janet has not yet petitioned for attorney fees." The court then found that "[b]oth sides needlessly increased the cost of litigation [and by] the award of marital assets *** each party has the ability to pay their own attorneys' fees."

¶ 30      On March 12, 2021, the parties informed the trial court that neither of them would buy out the other's share of M&J's stock and that Eric was attempting to obtain the financing to buy the parties out.

¶ 31      On March 17, 2021, the trial court appointed a receiver for M&J.

¶ 32      On March 24, 2021, Mark filed a motion to reconsider the court's judgment of dissolution. Mark argued that the trial court should not have allocated a 2017 Chrysler to Janet, because the vehicle was an asset of M&J.

¶ 33      On April 5, 2021, Mark filed a second motion to reconsider the court's judgment of dissolution, regarding the parties' time share and boat.

¶ 34      On February 2, 2022, the trial court entered an amended order that, *inter alia*, granted Mark's initial motion to reconsider.

¶ 35      On February 7, 2022, the receiver for M&J filed his report regarding the sale of M&J that related, *inter alia*, that Eric's company (IQM Solutions, LLC) purchased M&J for $2,495,000. Mark received $1,247,500 in cash from the sale and Janet accepted a promissory note for the same amount.

¶ 36      On April 28, 2022, the trial court entered an order that, *inter alia*, granted Mark's second motion to reconsider.

¶ 37      Janet filed her notice of appeal on May 10, 2022.

¶ 38                                    II. ANALYSIS

¶ 39     Before discussing the substance of this appeal, we address Janet's arguments that Mark's introduction and supplemental statement of facts sections contain argument in violation of Illinois Supreme Court Rules 341(h)(2) and (6). Ill. S. Ct. R. 341(h)(2) and (6) (eff. Oct. 1, 2022). Janet requests that we disregard the offending portions of Mark's brief.

¶ 40     While an appellee is not required to submit an introductory paragraph or statement of facts (see Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2022)), if he elects to do so, he must also comply with Rule 341(h)(6). The Illinois Supreme Court Rules are not "mere suggestions" but instead "have the force of law." *In re Denzel W.*, 237 Ill. 2d 285, 294 (2010). Where a party fails to substantially conform to the pertinent supreme court rules, his brief may justifiably be stricken. *Steven W. v. Meeli W.*, 2021 IL App (2d) 200652, ¶ 37. However, because striking a party's brief is a harsh sanction, we will not do so unless the party's noncompliance with the rules hinders our review. *Id.*

¶ 41     Here, we agree with Janet that Mark's introduction section and supplemental statement of facts improperly contain argument. With that said, the noncompliant portions of Marks's brief do not hinder our review, and therefore, we will not strike them. Instead, we simply disregard any argument contained in these sections and admonish counsel to carefully follow the requirements of the supreme court rules in future submissions.

¶ 42     Janet contends that the trial court erred because it (1) failed to allocate to her a greater share of the marital estate, (2) failed to grant her indefinite maintenance, and (3) failed to grant her petition for contribution to attorney fees.

¶ 43     Mark argues that we should not address these arguments because Janet invited any alleged errors when she agreed to accept a promissory note to help their son buy M&J.

¶ 44     The rule of invited error or acquiescence is a form of procedural default also described as estoppel. *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 33.

The rule prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error. *Id.* The reason for the rule is that it would be manifestly unfair to grant a party relief based on error introduced into the proceedings by that party. *Id.*

¶ 45    Here, the record does not support Mark's argument that Janet acquiesced to the alleged errors she now challenges. Janet filed pleadings requesting 65% of the marital estate, permanent maintenance, and contribution to her attorney's fees. Therefore, although Janet agreed to accept the promissory note, she sought the same relief in the trial court that she now seeks here. Accordingly, we reject Mark's argument that Janet invited error in this case.

¶ 46    Mark also asserts that Janet's arguments are waived because she did not object when the trial court ordered M&J's receiver to consummate the sale of the company with Mark receiving cash and Janet receiving a promissory note. Mark fails to recognize that Janet is not challenging the trial court's order regarding the sale of M&J.

¶ 47    In addition, Mark argues that Janet's arguments are waived or forfeited because she failed to raise them in a postjudgment motion. We disagree with Mark. Janet's failure to raise the alleged errors in a postjudgment motion did not forfeit the issues here: in a civil nonjury case, no postjudgment motion is necessary to preserve an issue on appeal. See Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994); *In re Merilee M.*, 409 Ill. App. 3d 983, 986 (2011). We now address Janet's arguments.

¶ 48                        A. Distribution of Marital Property

¶ 49    Janet contends that the trial court abused its discretion in its 50/50 distribution of marital property in light of the relevant factors of section 503(d) of the Act (750 ILCS 5/503(d) (West 2022)). Janet argues that the relevant statutory factors weigh in favor of a 65/35 distribution in her favor.

¶ 50    The Act requires the trial court to divide marital property in "just proportions," considering all relevant factors including, in part, the contribution of the parties to the marital property; the value of the property assigned to each spouse; the duration of the marriage; the relevant economic circumstances of each spouse when the division of property is to become effective; the age, health, station, occupation, amount and sources of income, vocational skills, and employability of the parties; and the reasonable opportunity of each spouse to acquire capital assets and income in the future. 750 ILCS 5/503(d)(1), (3), (4), (5), (8), (11) (West 2020).

¶ 51    A trial court's distribution of marital property will not be reversed, absent an abuse of discretion. *In re Marriage of Klose*, 2023 IL App (1st) 192253, ¶ 31. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or where no reasonable person would adopt the view of the trial court. *Brown v. Illinois State Police*, 2021 IL 126153, ¶ 49.

¶ 52    Initially, we address Janet's assertion that "the disparity between Mark's and 'her' financial circumstance[s] resulting from the trial court's judgment shocks the conscience, and the court should have never let that happen." We also address her contention that she has little cash compared to Mark because she "had to take" a promissory note for the sale of the business, whereas Mark received cash. Janet mischaracterizes the facts. The trial court's judgment did not cause the disparity between the parties' financial circumstances. Rather, the court awarded each party 50% of the business, and if neither party bought out the other, the court would appoint a receiver to sell the business and award each party 50% of the proceeds. Subsequently, neither party bought out the other and Janet accepted a promissory note for 50% of the sale price to help Eric's company buy the business. Further, the trial court did not order Janet to accept a promissory note instead of cash for the sale of her half of M&J. Janet cannot claim that the trial court committed error due to Janet's voluntary action taken after the court entered its judgment. Therefore, when considering

the relevant 503(d) factors, the trial court cannot be charged with failing to consider Janet's subsequent decision that rendered her with substantially less cash than Mark. Accordingly, we address only those factors raised by Janet that do not rely on her assertion that she has less cash ($1,247,500) than Mark.

¶ 53    Janet contends that subsections 503(d)(1), (4), (5), (8), and (11) weigh in her favor because of her contribution to M&J, the length of the marriage, and the parties' respective skills: Mark is a self-described "master machinist" while she is skilled at office work. See *id.* §§ 503(d)(1), (4), (5), (8), and (11). We reject Janet's argument.

¶ 54    Here, ample evidence supported the trial court's determination of the appropriate distribution of the marital estate, and Janet has not shown that its decision was an abuse of discretion. Janet argues that her contribution to the parties' business weighs in favor of a 65/35 distribution in her favor because she worked 50 to 60 hours a week, had a wide range of responsibilities, and the business would not have been viable without her contribution. However, Mark testified that at the beginning of the business he brought in the client that was responsible for 95% of the business, and he ran the business for 15 years prior to these proceedings (he programmed and operated machines, worked with customers and engineers, and managed the financial aspects of the business). The trial court found that each party owned 50% of the business, shared "a tremendous work ethic," and each drew equal salaries. Therefore, the trial court properly found that both parties contributed to M&J.

¶ 55    Further, after stating that it considered the factors set forth in the Act, the trial court concluded that a 50/50 split of the marital property was just. The record indicates that the court was aware of the parties' separate contributions to the family business, and the parties' ages, skills, lack of formal education beyond high school, the duration of the marriage, and Janet's contribution

by "working long hours as a manager at a White Castle while helping Mark start M&J all the time raising [the parties'] two children." The trial court considered the relevant 503(d) factors and did not abuse its discretion when it distributed the marital property equally.

¶ 56                                    B. Maintenance

¶ 57    Janet contends that the trial court erred by failing to award her indefinite maintenance. She urges us to reverse the trial court's "refusal" to award her indefinite maintenance. Mark counters that the trial court properly reserved the issue of maintenance.

¶ 58    In interpreting the provisions of a judgment of dissolution, we apply the rules for the interpretation of contracts. *In re Marriage of Figliulo*, 2015 IL App (1st) 140290, ¶ 13. The primary objective when interpreting a dissolution judgment is to carry out the intent of the court at the time of entry. *Id.* The intent of the court is to be determined only by the language of the dissolution judgment, absent an ambiguity. *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1017 (2011).

¶ 59    It is clear from the trial court's order that it reserved the issue of maintenance and did not "refuse" to award Janet maintenance. Rather, the trial court's order states, "Maintenance shall be reserved until it is determined if either party is going to purchase M&J Machinery."

¶ 60    The reservation of maintenance has statutory authority. Specifically, section 401(b) states:

> "Judgment shall not be entered unless, to the extent it has jurisdiction to do so, the court has considered, approved, *reserved* or made provision for *** the maintenance of either spouse and the disposition of property. The court shall enter a judgment for dissolution that reserves any of these issues either upon (i) agreement of the parties, or (ii) motion of either party and a finding by the court that appropriate circumstances exist." (Emphasis added.) 750 ILCS 5/401(b) (West 2020).

We will not reverse the court's decision to reserve the issue of maintenance unless the court abused its discretion, which means that no reasonable person would have taken the view adopted by the trial court. *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 168 (2005).

¶ 61     Here, the trial court reserved jurisdiction on the issue of maintenance because there was uncertainty regarding the sale of M&J, the parties' main marital asset. We determine that the trial court's decision to reserve maintenance was appropriate and well within the exercise of its discretion. Neither party purchased M&J. If Janet files another petition seeking maintenance the trial court shall consider it under the relevant 504(a) factors. 750 ILCS 5/504(a) (West 2020). Further, the trial court shall make specific findings of fact in accordance with section 504(b-2) of the Act including its reasoning for awarding or not awarding maintenance and references to each relevant section 504(a) factor. 750 ILCS 5/504(b-2) (West 2020).

¶ 62                                    C. Contribution to Attorney Fees

¶ 63     Janet contends that the trial court erred when it failed to grant her a hearing on her petition for contribution to attorney fees. At the outset, we note that Mark argues that Janet has forfeited this argument because she never requested a hearing on her petition. Mark's argument is unpersuasive.

¶ 64     Janet timely filed her petition for contribution to attorney fees as directed by the trial court and section 503(j) of the Act. 750 ILCS 5/503(j) (West 2020). Section 503(j) provides:

> "After proofs have closed in the final hearing on all other issues between the parties (or in conjunction with the final hearing, if all parties so stipulate) and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided." *Id.*

In *In re Marriage of Brackett*, 309 Ill. App. 3d 329, 345 (1999), we interpreted section 503(j) as not "requiring an additional hearing, which would further burden already overburdened trial courts, but, rather, as requiring the trial court to hear, through testimony or otherwise, additional proofs *** in the context of preexisting proceedings." In *In re Marriage of Hasabnis*, 322 Ill. App. 3d 582, 596 (2001), the court recognized the practical reality that, "[i]n most cases, once the trial court has weighed marital property criteria and, if awarded, maintenance criteria, it will have enough of a record to determine the contribution amount."

¶ 65     Here, in its final judgment of dissolution, the trial court erroneously stated that Janet had not filed a petition for contribution. Yet the trial court ordered that the parties "should each pay for their own attorney fees." Thus, although Janet was not entitled to a separate hearing on her petition, she was entitled to have her petition heard and decided. See *Brackett*, 309 Ill. App. 3d at 345; 750 ILCS 5/503(j) (West 2020). Because the trial court stated that it did not know that Janet filed a petition seeking contribution, the trial court abused its discretion when it denied her petition. For this reason, we vacate that portion of the judgment denying Janet contribution for attorney fees and remand for a hearing on her petition.

¶ 66                              III. CONCLUSION

¶ 67     For the reasons stated, we affirm the portion of the judgment of the circuit court of Lake County, regarding the distribution of marital assets and the reservation of maintenance. Further, we vacate the portion of the judgment that denied Janet's petition for contribution of attorney fees, and we remand for further proceedings.

¶ 68     Affirmed, in part, vacated, in part, and remanded.